77 A.3d 562

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Daniel Roger SMITH, Appellee.**

Supreme Court of Pennsylvania.

Argued May 8, 2012.

Decided Sept. 25, 2013.

---

220

Karen Ann Diaz, Esq., Doylestown, Stephen B. Harris, Esq., Warrington, David Ward Heckler, Esq., Doylestown,

Robert J. Salzer, Esq., Bucks County District Attorney's Office, for Commonwealth of Pennsylvania.

John J. Kerrigan Jr., Esq., Langhorne, for Daniel Roger Smith.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice BAER.

We accepted allowance of appeal in this case to examine whether the Superior Court erred in determining that police officers, when seeking consent from an individual for the testing of his blood for the presence of drugs or alcohol following a traffic accident, must inform the individual that the results of the test may be used for criminal or prosecutorial purposes. To the extent the Superior Court held that an officer must inform an individual that a positive result in a blood test may have criminal repercussions, and such failure renders any consent to the blood test invalid, the court erred. We further hold that the totality of the circumstances presented instantly support the trial court's conclusion that the suppression of blood test results was not warranted. Accordingly, we reverse the order of the Superior Court, and we remand this case to that court for consideration of issues that remain in abeyance.

During the evening of October 22, 2008, Appellee–Defendant, Daniel Roger Smith, consumed approximately eight beers while watching the Philadelphia Phillies defeat the Tampa Bay Rays in Game 1 of the World Series. He finished drinking at 11:00 or 11:30 that night and went to bed. He awoke the next morning and, apparently feeling no ill effects from his drinking the night before, drove himself to work. Around 11:00 a.m., Appellee drove from his place of employment to deposit the receipts from the previous day at a local bank. His course of travel took him along Oxford Valley Road in Middletown Township, Bucks County. He approached the intersection with Frosty Hollow Road and attempted to make a left-hand turn onto Frosty Hollow Road.

When Appellee began the left-hand turn, however, his vehicle violently collided with a car driving the opposite direction on Oxford Valley Road, which was operated by Mary McHugh with her husband, Joseph McHugh, as a passenger. After impact, Mrs. McHugh's vehicle struck a third car on Frosty Hollow Road, driven by Robin Cunliffe, and only came to rest after striking a fence on the side of the road. While neither Appellee nor Ms. Cunliffe were injured, it was immediately apparent that the McHughs suffered severe injuries. Indeed, Mrs. McHugh succumbed to her injuries several days after the accident, and Mr. McHugh is now permanently disabled.

Middletown Township Police arrived on the scene of the accident within a short period of time, and, eventually, accident reconstruction expert Officer Brian Agostino was dispatched to investigate the incident. Officer Agostino, who had been off-duty at the time of the accident, arrived on-scene out of uniform but wearing a hat that said "Middletown Township Police Department." He immediately began speaking with Appellee concerning the circumstances of the accident. He then walked over to the McHughs' vehicle, to discover that Mrs. McHugh had been transported to a local hospital, and rescue workers were attending to Mr. McHugh. Accordingly, Officer Agostino returned to Appellee and "asked him due to the seriousness of the accident with a potential fatality if he would submit to a chemical blood test," the purpose of which was "to eliminate any possibility that alcohol or controlled substance was involved." Notes of Testimony, Suppression Hearing (N.T.), Sept. 24, 2009 at 10, 12. Officer Agostino further told Appellee that he could refuse the test. *Id.* at 570.[1] While Appellee would subsequently dispute these facts, the trial court found the officer's versions of these events to be credible. N.T., Oct. 7, 2009 at 8.

1. Officer Agostino would later testify that, at the time he requested Appellee to submit to chemical testing, he seemed of sound mind and did not appear to be injured. *Id.* at 570. Further, Officer Agostino did not handcuff Appellee, read him a *Miranda* warning, or smell alcohol on Appellee. Consistently, Appellee would subsequently testify that he was not threatened, intimidated, or placed under arrest "and that he

Appellee agreed to the testing, and a second officer transported him to St. Mary's Hospital for the blood draw. Samples of Appellee's blood were submitted to a laboratory for testing, and two separate specimens indicated blood alcohol concentrations of 0.083 and 0.082 percent, respectively. Upon receiving the results of the chemical tests, Middletown Township Police arrested Appellee, and charged him with various crimes related to the accident, including DUI—general impairment/incapable of driving safely, DUI—general impairment (BAC of 0.08–0.10 percent), and homicide by vehicle while DUI.[2]

Prior to trial, Appellee moved to suppress the results of the blood testing, contending that the consent given was not informed or knowing and thus was illegally obtained, because Officer Agostino did not advise him that the test results could be used against him in a criminal proceeding. Taking into consideration the totality of the circumstances surrounding Appellee's consent, as related above, the trial court determined that his permission was informed, and thus valid, and denied suppression. A jury trial thereafter commenced and on November 19, 2009, the jury found Appellee guilty of the above-stated charges. The trial court subsequently sentenced Appellee to a term of imprisonment of three to six years.

Appellee filed a timely appeal to the Superior Court, contending, *inter alia*, that the suppression court erred by admitting the blood test evidence, because the police did not obtain informed and actual consent for the test from Appellee, making the draw an invalid search. The Commonwealth conceded that Officer Agostino lacked the probable cause required to order Appellee to take a blood test, but continued to assert that Appellee's agreement to take the test at Officer Agostino's request constituted sufficient consent.

In an unpublished memorandum, the Superior Court vacated Appellee's convictions and remanded for a new trial. It

submitted to the chemical testing to assist in Officer Agostino's investigation." *Id.* at 573.

**2.** 75 Pa.C.S. §§ 3802(a)(1), 3802(a)(2), and 3735(a), respectively.

noted that the taking of blood constitutes a search subject to the protections of the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. *Commonwealth v. Smith*, 944 EDA 2010 at *5, 29 A.3d 824 (Pa.Super. Apr. 6, 2011) (unpublished memorandum); *accord Commonwealth v. Davenport*, 453 Pa. 235, 308 A.2d 85, 87 (1973).[3] The court found that for consent to operate as a valid waiver of the right to remain free from warrantless searches, it must be voluntary and knowing. *Smith*, at *6 (citing *Commonwealth v. Walsh*, 314 Pa.Super. 65, 460 A.2d 767, 771–72 (1983)). The Superior Court had held in *Walsh* that consent to a blood test is invalid as unknowing where the defendant could show he had no notice or awareness of the criminal investigative purpose of the test. 460 A.2d at 772.[4]

The court in this case determined that the rationale in *Walsh* discussed when the assent apparently given by a criminal defendant meets the knowledge requirement implicit in a valid consent. *Smith*, at *6. The court stated that it may have been reasonable to believe that Appellee might have "guessed" that police requested the blood test for a criminal investigation. *Id.* at *8. However, the panel found that the Superior Court's decision in *Commonwealth v. Danforth*, 395 Pa.Super. 1, 576 A.2d 1013 (1990) (*en banc*), constrained it from affirming the trial court's denial of suppression premised upon Appellee's surmisal, because officers "ha[ve] a duty to inform" defendants that results may be used as prosecutorial evidence. *Id.* at *12.[5]

3. We note that, both in the Superior Court and before this Court, the parties have analyzed the issues presented herein as coextensive under the Fourth Amendment and Article I, Section 8. We accordingly accept that premise without analysis or imprimatur for purposes of disposition of this case.

4. The panel noted that to the extent the parties argued that the consented to search needed to be voluntary and knowing, no dispute existed that Appellee gave voluntary consent. The only issue was whether the consent was knowing.

5. The primary issue in *Danforth* concerned the constitutionality of 75 Pa.C.S. § 1547(a)(2), which imputed implied consent for chemical

In *Danforth,* the defendant crashed her car in the early morning while returning from a bar, killing her passenger. The investigating officer did not suspect that the defendant was under the influence of alcohol, but encouraged her to go to the hospital to treat her injuries. At the hospital, the officer asked the defendant to take a blood test based on the severity of the accident. The officer told her the test was in furtherance of his accident investigation, but he did not give the defendant a *Miranda* warning, tell her that the blood test could be used against her in a criminal proceeding, or have her sign a written consent form. The officer further assured her that she was not under arrest when he requested the blood draw consent. The defendant gave her consent for the blood draw, and the results of the test revealed a BAC of 0.21 percent. The defendant was charged with and subsequently convicted of, *inter alia,* homicide by vehicle while DUI. *Danforth,* 576 A.2d at 1015–16.

On appeal, the *Danforth* Court held that the defendant's consent to the blood test was not actual and voluntary, and therefore invalid because the uncontradicted evidence showed that she had no notice of the criminal investigative purpose of the test. *Id.* at 1023 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Specifically, the court considered the defendant's lack of understanding of constitutional rights or previous encounters with the judicial process; that she was not provided *Miranda* warnings; her reluctance to seek medical care for her injuries; and the officer requesting the test as a part of his "accident" investigation, all as being insufficient to put the defendant on notice of the potential criminal ramifications of the blood test, because the reasonable person would have no objective reason "to

blood testing to drivers of the Commonwealth's highways. The Superior Court struck Section 1547(a)(2) as unconstitutional, which this Court affirmed *sub nom.* in *Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308 (1992). Only after the *Danforth* Court struck Section 1547(a)(2) did it necessarily consider the validity of any actual consent given by the defendant in that case. Thus, the crux of *Danforth* concerned imputed implied consent, as opposed to the "knowledge and consent" issue currently before us.

believe that the investigation was any different from a routine accident investigation." *Id.*

Applying *Danforth* and *Walsh* to the instant case, the Superior Court examined the fact that Officer Agostino, in requesting the blood test, never explicitly informed Appellee that the results were in furtherance of, or could be used against him in, a criminal investigation. *Smith,* at *8–9 (citing *Danforth,* 576 A.2d at 1023); & *12 (citing *Walsh,* 460 A.2d at 772). The court continued by noting that Officer Agostino never related any reason that would cause Appellee to suspect that the test was intended for any purpose other than a routine accident investigation. On these bases, the court held that Appellee lacked notice or awareness of the criminal ramifications of the blood draw. *Id.* at *8–10 (citing *Danforth,* 576 A.2d at 1023).

Reasoning, then, that Officer Agostino would not have asked for the testing if he did not intend to use a positive result against Appellee criminally, the court held that Officer Agostino "had a duty to inform" Appellee of this fact when seeking his consent. *Id.* at *11. Accordingly, the court held that Officer Agostino's failure to inform Appellee of the criminal consequences of the blood test had the effect of misleading or coercing Appellee, rendering his consent unknowing and invalid. *Id.* at *12 (citing *Walsh,* 460 A.2d at 772 ("[C]onsent can be invalidated if the consenter did not understand what it was he was consenting to.")). Additionally, the Superior Court dismissed any factual differences between *Danforth* and this case as either not impacting, or even strengthening, its conclusion that Appellee did not give knowing consent to the blood testing.[6] *Id.* at *10–11.

6. The undisputed factual differences between *Danforth* and this case include: *Danforth* involved a single-car accident whereas this case resulted from a multiple-vehicle crash; the defendant in *Danforth* was encouraged by police to go to the hospital for treatment and only after arriving was she asked to take the test, while Appellee, who was uninjured, was asked at the scene of the accident to submit to blood testing; and the officer in *Danforth* was operating under a portion of the implied consent statute, 75 Pa.C.S. § 1547(a)(2), which the Superior Court in that case stuck down, while the officer in Appellee's case

The court therefore concluded that the blood test was administered in violation of Appellee's Fourth Amendment and Article I, Section 8 constitutional rights, and that the results of the test should have been suppressed at trial. *Id.* at *12. Thus, the court vacated the judgments of sentence and remanded for a new trial on all charges. The Commonwealth petitioned this Court for allowance of appeal, which we granted to consider whether the Superior Court misapplied precedent in reversing the denial of suppression.[7]

▮▮▮▮ In a case where the Superior Court has reversed a trial court's denial of a suppression motion, our standard of review in addressing the Commonwealth's subsequent appeal is limited to determining whether the trial court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *See In re J.E.*, 594 Pa. 528, 937 A.2d 421, 425 (2007) (citing *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (2003)). Because the Commonwealth prevailed in the suppression court, we consider only the Commonwealth's evidence and the

knew he needed to obtain Appellee's express, actual, and informed consent. *Smith*, at *10–12 (citing *Danforth*, 576 A.2d at 1023).

7. Specifically, and as related in this Court's order granting allowance of appeal, the Commonwealth has raised three specific issues related to the Superior Court's reversal of the denial of suppression:

a. Whether the Superior Court's holding that Respondent's consent to a blood alcohol test was invalid was an unreasonable application of the Fourth Amendment's prohibition against unlawful searches and seizures, where the totality of the circumstances demonstrated that Respondent's consent was freely and voluntarily given, where there was no force or coercion by police, where Respondent was advised of his right to refuse, and where Respondent was aware that the consent was being requested as a result of a police investigation into a three-vehicle motor vehicle collision with a possible fatality, wherein respondent was one of the operators involved?

b. Whether the Superior Court, in finding that Respondent's consent was invalid because it was not "knowing," overlooked, misapprehended and/or ignored the record set forth below, and improperly acted as fact finder in reweighing the evidence, thereby invading the province of the suppression court?

c. Whether the Superior Court misapplied the Pennsylvania [Superior] Court's holding in *Danforth* as the facts in *Danforth* [sic] are significantly different from the circumstances in the instant case?

*Commonwealth v. Smith*, 612 Pa. 473, 31 A.3d 285 (2011) (*per curiam* ).

evidence presented by Respondent that remains uncontradicted when read in the context of the record as a whole. *Bomar*, 826 A.2d at 842. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn from them are in error. *Id.*

As Appellant, the Commonwealth begins by noting that it is black-letter, well-established law that examinations of the legality and constitutionality of warrantless, but consented to searches and seizures are examined objectively under a totality of the circumstances test to determine whether the consent was "the product of an essentially free and unconstrained choice" and not the result of coercion or duress. *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 901 (2000). Under this maxim, no one fact, circumstance, or element of the examination of a person's consent has talismanic significance. *Commonwealth v. Gillespie*, 573 Pa. 100, 821 A.2d 1221, 1225 n. 1 (2003). The Commonwealth notes that, pursuant to this baseline examination, it is a court's function to determine whether a criminal defendant voluntarily and knowingly gave his consent to be subjected to a search or seizure as contemplated by the Fourth Amendment and Article I, Section 8. *Walsh*, 460 A.2d at 771–72.

The Commonwealth points to *Walsh*, which, while a Superior Court decision, provided, in its view, a cohesive summary of jurisprudence from the United States Supreme Court, this Court, and the Superior Court on what constitutes a "knowing" waiver of Fourth Amendment rights. *Walsh* begins by noting that the United States Supreme Court in *Schneckloth*, 412 U.S. at 228–29, 93 S.Ct. 2041, opined that consents to warrantless searches and seizures cannot be the result of "subtl[e] ... coercion" or "stealthy encroachments." This Court has similarly stated that consent for a search "may not be gained through stealth, deceit or misrepresentation, and that if such exists this is tantamount to implied coercion." *Commonwealth v. Wright*, 411 Pa. 81, 190 A.2d 709, 711 (1963). The Commonwealth notes that the Superior Court has therefore taken the view "that a consent can be invalidated if

the consenter did not understand what it was he was consenting to." *Walsh*, 460 A.2d at 772. Under this view, consent must be knowingly given, such that a defendant must possess "at least a minimal sense of awareness of what was going on, vis-à-vis, the consent." *Id.* Specific to blood draws and testing: "such a minimal sense of awareness would undoubtedly include an apprehension of some relatedness to a criminal investigation." *Id.*[8]

Accordingly, in a general sense, the Commonwealth avers that the Superior Court in this case ignored the above-stated precepts and instead erred in creating, essentially, a *per se* rule that an officer, in every instance, must inform the putatively consenting party that the results of the blood draw may be used against him in a criminal prosecution. The Commonwealth argues that Fourth Amendment jurisprudence does not mandate that an officer has "a duty to inform" the consenting party of the potential that a positive result will be used against him. *Smith*, at *11. Rather, a "minimal sense of awareness" may be objectively exhibited by demonstrating that a reasonable person would have comprehended the possible criminal ramifications of the blood draw under the totality of the circumstances presented; an explicit warning is not required. *Accord Gillespie*, 821 A.2d at 1225 n. 1.

Specific to this case, the Commonwealth argues that the totality of the circumstances presented lead to the conclusion that Appellee possessed a minimal awareness necessary that the consent to blood testing could have "some relatedness to a criminal investigation." *Walsh*, 460 A.2d at 772. The Commonwealth points to the following facts, all conclusively deter-

8. Pursuant to this jurisprudence, the Superior Court in *Walsh* determined that the defendant in that case had knowingly, and therefore validly, given his consent to a blood alcohol test. The facts leading to this conclusion included: the officer "Mirandizing" the defendant; the officer informing him that the motor vehicle accident had resulted in a fatality; the defendant giving his account of the accident; the defendant signing a medical consent form for the blood test; and the defendant being coherent when signing the form. Notably, at the time of the blood draw, the defendant in *Walsh* was not suspected of, or under arrest for, driving under the influence of drugs or alcohol.

mined by the trial court and supported by the record.[9] When Officer Agostino arrived on the scene of the accident, he was not in uniform or carrying his service weapon. He immediately inquired of Appellee about how the crash occurred, told Appellee about the serious and potentially fatal nature of the accident, and asked Appellee to consent to a blood test "due to the seriousness of the accident" to eliminate the possibility of drugs or alcohol being involved. Officer Agostino further informed Appellee that he could refuse to take the test. Nonetheless, Appellee, who was not injured, agreed to be transported to a local hospital for the blood draw, gave a sample of his blood, and police returned him to the scene of the accident immediately thereafter. At no point did police ever place Appellee under arrest or in custody. The Commonwealth accordingly states, "A reasonable and objective evaluation of the facts and circumstances here demonstrate that Appellee had reasonable notice of what was being requested, the reason it was being requested and with that knowledge he consented to the blood draw. [ . . . ][W]hat else would the average person believe that the police [would] possibly do with those results?" Commonwealth's Brief at 19 & 21–22.

The Commonwealth then distinguishes on three separate points this case from *Danforth,* which the Superior Court found controlling, requiring Officer Agostino to have informed Appellee that the results of the test could be used against him in a criminal proceeding. First, the Commonwealth avers that the voluntary or knowing nature of the consent in *Danforth* was not primarily at issue, as the case primarily concerned the constitutionality of an implied consent law then in effect. *See supra* note 5. Thus, the trial court in *Danforth* never made factual or credibility determinations concerning the defendant's consciousness of consent, the premise upon which the Superior Court based its decision concerning the validity of the consent. *Danforth,* 576 A.2d at 1016. Second, the defendant in *Danforth* could have reasonably believed that the

9. And, thus, in the Commonwealth's view, those facts are unassailable on appellate review. *Accord Bomar,* 826 A.2d at 842.

blood draw was for medical purposes, as she was at the hospital being treated for injuries sustained in the crash; here, Appellee had suffered no injuries so the only possible reason for the chemical blood test was to determine if Appellee was under the influence of drugs or alcohol for prosecutorial purposes. Finally, *Danforth* did not set down a *per se* rule as the Superior Court did here. Rather, *Danforth* examined the totality of the circumstances presented in that case and determined that the defendant did not possess notice or awareness concerning the circumstances of the blood test.

Appellee responds by acknowledging that generally an examination into the validity of a given consent in a Fourth Amendment case should be performed under a totality of the circumstances test. Nevertheless, Appellee echoes the holding of the Superior Court below that, under *Danforth,* he "did not knowingly consent to submit to blood testing, because he was never advised of the criminal nature or implications of such testing." Appellee's Brief at 12. Appellee attempts to connect this case to Fifth Amendment/*Miranda* jurisprudence, which mandates that criminal defendants must explicitly be informed concerning their rights to silence and counsel in a pre-trial, custodial situation. In Appellee's view, like Fifth Amendment cases, "a defendant must, *specifically,* be advised of the possible criminal uses and implications of blood alcohol testing." *Id.* (citing *Danforth,* 576 A.2d at 1023; *Walsh,* 460 A.2d at 771) (emphasis by Appellee).

Appellee then concludes that the facts of this case are no different than *Danforth,* and points to three specific similarities: neither defendant was advised that the results of the blood test could be used in a criminal proceeding, given *Miranda* warnings, or provided with a consent form that explained the ability to refuse the test. In Appellee's view, the Superior Court correctly determined that *Danforth* controls and, without explicit warnings concerning the ability to use blood alcohol tests against defendants, average citizens will never possess a "minimal sense of awareness" concerning the nature of the test.

As noted by both parties, the focus of this case revolves around the Superior Court's holding that Officer Agostino "had a duty to inform [Appellee]" that a positive result from the chemical testing could be used against him in a prosecution, and that such failure "to inform [Appellee] that a positive test result could have criminal ramifications result[ed] in [Appellee's] being misl[e]d, rendering the consent invalid." *Smith*, at *11–12. In Fourth Amendment/Article I, Section 8 cases, this Court and the United States Supreme Court have been equally clear that per se rules, like the one seemingly established by the Superior Court instantly, are extremely disfavored. *See e.g. United States v. Drayton*, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Commonwealth v. Au*, 615 Pa. 330, 42 A.3d 1002 (2012). Rather, courts must objectively examine the totality of individual circumstances presented in each case. *Au*, 42 A.3d at 1008.

■ Despite this clear jurisprudence, Appellee avers that we should agree with the mandate created by the Superior Court and decide this case in accord with the strict warning requirements normally found in Fifth and Sixth Amendment jurisprudence. We decline to do so. Contrary to the strict protections associated with trials, the investigating character and fluid nature of searches and seizures render rules that require detailed warnings by law enforcement simply unfeasible. *Schneckloth*, 412 U.S. at 231, 93 S.Ct. 2041. These unique attributes of Fourth Amendment scenarios place cases such as that presented instantly in a different realm than the "structured atmosphere of a trial where ... a defendant is informed of his trial rights." *Id.* Fourth Amendment cases concern the prohibition against "unreasonable" searches and seizures; the very wording of the constitutional protection lends itself to examinations of particular facts and circumstances in individualized cases. "The Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Commonwealth v. Kohl*, 532 Pa. 152, 615 A.2d 308, 312 (1992)

(quoting *Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

■ Contrarily, under the Fifth and Sixth Amendment guarantees of trial rights, "[T]he Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial." *Schneckloth,* 412 U.S. at 242, 93 S.Ct. 2041. Accordingly, "it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning," such as that required by *Miranda. Id.* at 231, 93 S.Ct. 2041; *see also Commonwealth v. Funk,* 254 Pa.Super. 233, 385 A.2d 995, 1000 (1978) (noting that "blood samples are not testimonial evidence, and come under the protection of the [F]ourth, not the [F]ifth, [A]mendment ... and therefore do not get *Miranda* protection.").

■ Further, the decisions of the Superior Court in *Walsh* and *Danforth,* which the panel below cited as necessitating the mandate of explicit warnings to potential DUI-defendants, specifically embraced the principle that the Fourth Amendment does not operate properly with established bright lines. Indeed, contrary to the holding of the Superior Court that these cases required Officer Agostino to inform Appellee of the officer's intent to use a positive result against him, neither of these decisions put into place per se rules or mandated explicit warnings. Rather, both cases considered whether the defendant, under an objective view of the totality of the circumstances presented, could "establish that he had no notice of the criminal investigative purpose of the blood test...." *Walsh,* 314 Pa.Super. 65, 460 A.2d 767, 773; *see also Danforth,* 576 A.2d at 1022–23 (applying *Walsh* and a non-exclusive list of factors relevant to a determination of whether consent was valid in the totality of circumstances provided). Moreover, this Court has been clear that no one fact or circumstance can be talismanic in the evaluation of the validity of a person's consent. *Gillespie,* 821 A.2d at 1225 n. 1; *see also Commonwealth v. Smith, J.,* 470 Pa. 220, 368 A.2d 272,

277 (1977). Accordingly, to the extent the Superior Court held that police officers must explicitly inform drivers consenting to blood testing that the results of the test may be used against them in criminal prosecutions in order for the consent to be valid, it went too far.

■ Our analysis does not end there, however, as we granted allowance of appeal to determine the ultimate question of whether the Superior Court misapplied precedent in reversing the trial court's denial of suppression. Upon an examination of the totality of the circumstances presented herein, we respectfully hold that the Superior Court did err in this regard, reverse its suppression of Appellee's blood test, and remand for further proceedings consistent herewith.

As noted by the trial court in its Rule 1925(a) opinion, it opined from the bench when denying suppression that "although there was disputed testimony . . . as to what actually occurred [between Appellee and Officer Agostino when the consent was obtained], I'm going to side on behalf of the police as far as what was said to the defendant in making this decision." N.T., Oct. 7, 2009 at 8.[10] Accordingly, as related in the Rule 1925(a) opinion, we are bound by the following facts:

> Officer Agostino testified that as part of his investigation he asked [Appellee] to submit to chemical blood tests due to the seriousness of the accident and the potential fatality involved, in an effort to eliminate the possibility that alcohol or a controlled substance was involved. Officer Agostino informed [Appellee] he could refuse chemical testing if he chose to do so, and with that information, [Appellee] agreed to submit to the tests. [Appellee] was not in handcuffs, not in custody, and Officer Agostino did not smell alcohol on or about [Appellee] at any time during their interaction. Officer Buckley transported [Appellee] in the front seat of his vehicle to St. Mary's Hospital for the chemical testing and returned him to the accident scene upon the completion. [Appellee] testified that he was not threatened, intimidated or placed under arrest and that he submitted to the chemi-

10. *Cf. supra* pp. 565–66.

cal testing to assist in Officer Agostino's investigation. [Appellee] testified that he never asked Officer Agostino as to why he had to submit to a chemical blood test or anything related to the blood test.

Tr. Ct. Op. at 2–3 (internal citations omitted). Moreover, it is undisputed that Appellee was not physically injured in the accident. *Id.* at 8.

In determining the validity of a given consent, "the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Strickler,* 757 A.2d at 901; *see also Schneckloth,* 412 U.S. at 228–29, 93 S.Ct. 2041 (invalidating searches that are the result of "subtl[e] ... coercion" or "stealthy encroachments"); *Wright,* 190 A.2d at 711 (consents to search "may not be gained through stealth, deceit or misrepresentation...."). "The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent." *Commonwealth v. Reid,* 571 Pa. 1, 811 A.2d 530, 549 (2002). Such evaluation includes an objective examination of "the maturity, sophistication and mental or emotional state of the defendant...." *Strickler,* 757 A.2d at 901. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation. *See Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427, 433 (1999) ("one's knowledge of his or her right to refuse consent remains a factor in determining the validity of consent ..." and whether the consent was the "result of duress or coercion.")

Objectively considering the totality of the circumstances, we find that the trial court correctly found that Officer Agostino did not use deceit, misrepresentation, or coercion in seeking Appellee's consent for the blood draw and testing, thus not invalidating the blood draw or the results therefrom on those

bases.  Here, the facts reveal that Appellee was a college graduate,[11] was not injured, and was explicitly informed of his right to refuse the test.  Appellee further understood that the test was to rule out the possibility that alcohol or drugs were factors in the accident.  With all of these understandings in mind and his faculties fully about him, Appellee willingly went to the hospital and participated in the blood draw.  On the basis of the totality of the evidence, when viewed objectively, we conclude that a reasonable person's consent to this blood draw would have contemplated the potentiality of the results being used for criminal, investigative, or prosecutorial purposes.[12]  Thus, Officer Agostino validly obtained from Appellee his consent for the blood alcohol test.[13]

11.  While the trial court did not cite this fact, Appellee testified as such and it is in the record.  *See* N.T., Sept. 24, 2009 at 55.

12.  Further, a comparison of the totality of the circumstances in this case to those presented in *Danforth* and *Walsh* supports the conclusion that suppression was properly denied.  In *Danforth*, where suppression was deemed proper, the defendant had suffered injuries and been taken to the hospital, and had not been "Mirandized."  Accordingly, a reasonable person could have believed that the blood draw was for medical purposes, and the finding that reasonable "notice of the possible criminal ramifications of the blood test" was not present in the case was supported by the record.  *Danforth*, 576 A.2d at 1023.  Contrarily, many of the facts from *Walsh*, where the court properly denied suppression, align with this case, including:  the officer informed the defendant of the seriousness of the crash, including a potential fatality;  the defendant fully provided his account of the accident;  and the defendant was uninjured and coherent when he gave consent for the blood draw.  Accordingly, nothing from *Danforth* or *Walsh* constrain our conclusion that "the reasonable person would have understood from the exchange between" Officer Agostino and Appellee that the purpose of the test was for investigative, criminal, or prosecutorial purposes.  *Reid*, 811 A.2d at 549.

13.  We are further compelled to note at this juncture that the Superior Court, and thus to great extent the parties, concentrated specifically on whether Appellee's consent was knowingly given, separate and apart from the well-established notion that a valid consent is one given voluntarily.  *See supra* note 4. To the extent the parties and courts below did so, such analysis was deficient, as both the United States Supreme Court and this Court have opined that the government need not separately prove the knowing nature of a consent during a suppression hearing;  rather, evidence of the knowledge of the consenting party is encompassed within the analysis of the voluntariness requirement.  *See Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. 2041; *Strickler*, 757 A.2d at 901 (each holding, in the context of an asserted (and rejected)

The order of the Superior Court is reversed, and this case is remanded to that court for consideration of any issues that remain pending.

Jurisdiction relinquished.

Former Justice ORIE MELVIN did not participate in the decision of this case.

Justices SAYLOR, TODD and McCAFFERY joined the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion, with the exception of (1) the Majority's apparent approval of the Superior Court's decisions in *Danforth* [1] and *Walsh* [2] subject to an inaccurate disclaimer that "neither of these decisions put into place *per se* rules or mandated explicit warnings" regarding a suspect's knowledge of the criminal investigative purpose of a search, *see* Maj. Op. at 232–35, 77 A.3d at 571–72; and (2) the Majority's sugges-

requirement that police officers must inform the consenting party of the right to refuse to consent, that the government is not required to demonstrate the consenting party's knowledge of that right to refuse; instead, the traditional examinations of the coercive nature of the interaction and the maturity, intelligence, and education of the consenting party will assist in the determination of the scope, and therefore voluntariness, of the consent). No party, however, recognizes this nuance, assumedly because of the Superior Court's reliance on *Danforth* and *Walsh*, and those decisions' employment of a "knowing" requirement.

Consequently, while we examine the facts and circumstances of *Danforth* and *Walsh* extensively throughout this opinion, both to scrutinize the arguments and analyses of the lower courts and parties fully, and as a comparison with the factual scenario presented by this case, given that we do not view the law as requiring a separate "knowledge" prong of a consent analysis to dispose of this genre of cases, we do not give our judicial imprimatur to any language from *Danforth* or *Walsh* to that effect.

1. *Commonwealth v. Danforth*, 395 Pa.Super. 1, 576 A.2d 1013 (1990) (*en banc*).

2. *Commonwealth v. Walsh*, 314 Pa.Super. 65, 460 A.2d 767 (1983).

tion, on multiple occasions, that a defendant's knowledge of the possible use of blood test results in a subsequent criminal prosecution against him is a required, rather than merely a relevant, factor in an assessment of voluntary consent. *See id.* at 236–38, 77 A.3d at 573–74 (holding that "[o]n the basis of the totality of the evidence, when viewed objectively, we conclude that a reasonable person's consent to this blood draw would have contemplated the potentiality of the results being used for criminal, investigative, or prosecutorial purposes. Thus, Officer Agostino validly obtained from Appellee his consent for the blood alcohol test."); *id.* at 237 n. 12, 77 A.3d at 573–74 n. 12 ("Accordingly, nothing from *Danforth* or *Walsh* constrain [sic] our conclusion that 'the reasonable person would have understood from the exchange between' Officer Agostino and Appellee that the purpose of the test was for investigative, criminal, or prosecutorial purposes.") (internal citations omitted).

There is some unresolved tension in the Majority Opinion respecting both points of concern. Taking the second point first, as I understand the law, although a defendant's knowledge of the possible criminal investigative purpose of a search obviously may be relevant to an assessment of the voluntariness of a consent, it is not at all a required element. The Majority indicates a similar understanding in parts of its Opinion. *See id.* at 235, 77 A.3d at 572 ("Accordingly, to the extent the Superior Court held that police officers must explicitly inform drivers consenting to blood testing that the results of the test may be used against them in criminal prosecutions in order for the consent to be valid, it went too far."); *id.* at 238 n. 13, 77 A.3d at 574 n. 13 (" . . . given that we do not view the law as requiring a separate 'knowledge' prong of a consent analysis . . . we do not give our judicial imprimatur to any language from *Danforth* or *Walsh* to that effect."). Yet, the Court's holding is framed entirely in terms of the defendant's "objective" knowledge of the possible criminal investigative purposes.

There is a similar discord respecting *Danforth* and *Walsh.* On the one hand, as noted in the above paragraph, the Court's concluding footnote emphasizes that it does not put its imprimatur on any language in *Walsh* and *Danforth* suggesting a

requirement that the defendant know the criminal investigative purpose of a search in order for a consent to be valid. But, earlier in the Court's opinion, it insists that neither of those decisions "put into place *per se* rules or mandated explicit warnings" concerning the criminal investigative purposes of the requested search. *Id.* at 234, 77 A.3d at 572.

In my view, *Walsh* and *Danforth* plainly employed a *per se* rule requiring evidence of the defendant's knowledge of the criminal investigative purposes of a search in order for a consent to be valid;[3] we should recognize the fact; and we should specifically disapprove of the decisions to that extent. That approach would provide the best teaching to the bench and bar. I understand the Majority's instinct to harmonize the decisional law, even if it involves law from a lower court, particularly because the parties argue their cases not in terms of what is the better or clearer jurisprudence, but merely in terms of analogy and distinction, accepting the lower court cases as they are. But, in this instance, the attempt to harmonize the atonal has resulted in a Majority Opinion that, for its many flashes of commendable and helpful lucidity, at times only adds to the dissonance.

The Fourth Amendment rule established in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), is that the "voluntariness" of a suspect's consent to a search does not even require proof of knowledge of the elemental right to refuse to consent. In *Walsh*, however, a three judge panel decision of the Superior Court joined by two judges (Judge Wieand concurred in the result), rephrased the Fourth Amendment consent to search issue presented and injected a different knowledge requirement—one related to the purpose of the search. Thus, the panel held that, for a consent to be valid, the defendant must have "a minimal sense of awareness [that] would undoubtedly include an apprehension of some relatedness to a criminal investigation." *Walsh*,

---

**3.** The practical and inevitable effect of a court conditioning the validity of a consent upon a defendant's appreciation of a specific fact—as *Walsh* and *Danforth* explicitly did—is to require police to issue *Miranda* style "warnings" respecting that fact. Otherwise, all consent searches are imperiled.

460 A.2d at 772. The court claimed that its establishment of this requirement was not in tension with *Schneckloth* because different knowledge was at issue:

> At this point, it is [sic] to observe that the issue before us is quite distinct from that in *Schneckloth.* To say, as did *Schneckloth,* that one need not necessarily know of his right to refuse is not the equivalent of holding that one need not know what is being consented to is a search for criminal prosecution purposes, and not a test for medical treatment purposes. Thus, our decision here is not inconsistent with *Schneckloth* or other U.S. Supreme Court interpretations of the Fourth Amendment.

*Id.* at 771. In a coda that immediately followed the offered distinction, however, the panel suggested that, even if its ruling was inconsistent with *Schneckloth,* it was the court's "prerogative" to deviate from the High Court's precedent:

> However, even if it were [inconsistent], it is always our prerogative to circumscribe governmental action more severely than the Federal Courts. In this precise context, the Ninth Circuit Court of Appeals has said: "Constitutional rights may be protected by a state-court system which has developed its own method of testing the voluntariness of consent." *Tremayne v. Nelson,* 537 F.2d 359 (9th Cir.1976). Justice Eagen wrote: "However, the state has the power to impose standards on searches and seizures higher than those required by the Federal Constitution. *See Cooper v. State of California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967)." *Commonwealth v. Harris,* 429 Pa. 215 at 219, n. 2, 239 A.2d 290 at 292 n. 2 (1968).

*Id.* There is no indication that the defendant in *Walsh* ever raised or preserved a claim under the Pennsylvania Constitution, or argued for a broader or distinct right under our charter, such that the *Walsh* panel was free to improvise a *per se* rule in the consent search arena that might deviate from governing federal law.

Walsh is an odd, even a rogue, precedent: a case presenting a Fourth Amendment issue, leading to a holding that was self-consciously rendered in apparent conflict with governing fed-

eral law, then presumably "insulated" from federal correction by a reference to some state court "prerogative" to award greater constitutional rights, and establishing a *per se* requirement of knowledge for consent searches. The jurisprudence only gets worse. Although the panel adopted this prescriptive rule to the detriment of the Commonwealth in a published opinion, the panel ultimately upheld the search, which left the Commonwealth, as the prevailing party, "unaggrieved" and unable to seek further review in the Pennsylvania Supreme Court. Thus, the Court was not called upon to review the decision, and we have never approved of the *per se* rule it established—until today.

The Majority states that *Walsh* and *Danforth* do not require "knowledge of the right to refuse consent," *see* Maj. Op. at 237 n. 13, 77 A.3d at 574 n. 13, but respectfully, the Majority misreads the decisions. The *Walsh* panel surveyed cases from Superior Court, from this Court, and from other jurisdictions and then plainly held: "Therefore, we conclude that if appellant can establish that he had no notice of the criminal investigative purpose of the blood test, his consent would be invalid." 460 A.2d at 773. The panel unequivocally held that a defendant's knowledge of the criminal investigative purpose was a *per se* requirement of a valid consent.

The *Danforth* Court certainly understood its precedent in *Walsh* as **requiring** that the defendant have knowledge of the criminal investigative purpose of the search:

> In *Commonwealth v. Walsh, supra,* this Court noted that any understanding of investigative procedures would not weigh in favor of a finding of an intelligent and knowing consent in the absence of some awareness that the blood test being consented to was part of a criminal investigation. *Commonwealth v. Walsh, supra,* 314 Pa.Super. at 75–76, 460 A.2d at 772. The Court concluded that if the defendant "can establish that he had no notice of the criminal investigative purpose of the blood test, his consent would be invalid." *Id.* at 77, 460 A.2d at 773.

576 A.2d at 1023. Indeed, application of this *per se* requirement was the very basis for the decision in *Danforth.* The

court began its analysis by stressing that "[t]he uncontradicted evidence in this case shows that appellant had no notice of the criminal investigative purpose of the blood test," and after explaining why that was so, further explained that "[a]ppellant had no reason to believe that the investigation was any different from a routine accident investigation. Given these facts, we must conclude that appellant was not put on notice of the possible criminal ramifications of the blood test." *Id.*

The actual governing rule, articulated in *Schneckloth* and explicitly adopted by this Court in *Commonwealth v. Cleckley*, 558 Pa. 517, 738 A.2d 427 (1999), requires only that the totality of the circumstances indicates that the defendant gave voluntary consent, that is, consent free from deceit, misrepresentation, or coercion. The Majority—like the courts in *Walsh* and *Danforth*—focuses on appellee's knowledge of the purpose of the search, which bears on the scope of consent and the existence of any deceit or misrepresentation. *See* Maj. Op. at 573 (citing *Cleckley*, 738 A.2d at 433). But, the Majority's ultimate conclusion is tied explicitly to the question of whether "a reasonable person's consent to this blood draw would have contemplated the potentiality of the results being used for criminal, investigative, or prosecutorial purposes." *See* Maj. Op. at 237 & n. 12, 77 A.3d at 573–74 & n. 12. In this regard, the Majority seems to lapse back into the error of the courts in *Walsh* and *Danforth, i.e.,* applying a knowledge requirement that subsumes the other factors in "the totality of the circumstances" analysis.

At one point, the Majority states that the Superior Court "seemingly established" a *per se* rule here. Maj. Op. at 233, 77 A.3d at 571. That is a rather gentle way of stating the obvious; as with *Walsh* and *Danforth,* I would be more direct and accurate and say, like Hamlet (in explaining to his mother that his grief over his father's sudden and mysterious death/murder was not feigned): " 'Seems,' madam? Nay, it is. I know not 'seems.' " [4] *Walsh* and *Danforth* did create a *per se* rule requiring "knowing" consent regarding the purpose of the search, and the Superior Court here followed in that vein by requiring an officer to explicitly inform the suspect of that

4. Hamlet, Prince of Denmark, Act I, scene 2.

purpose. The panel below erred and its mistake was not that it strayed from *Walsh* and *Danforth;* the mistake is contained within those precedents, which this Court should squarely disapprove.

Again, knowledge (whether actual or "objective") of the criminal investigative purposes of a search may certainly be a relevant factor in determining the voluntariness of consent, but it is not a necessary one. The Majority issues conflicting signals on the question. I would be more direct, make clear that such knowledge is not required, and couch the holding in those terms.

Justice EAKIN, concurring.

I agree with Chief Justice Castille that a more direct explanation of our holding as it pertains to *Commonwealth v. Walsh*, 314 Pa.Super. 65, 460 A.2d 767 (1983), and *Commonwealth v. Danforth*, 395 Pa.Super. 1, 576 A.2d 1013 (1990), would clarify our rule going forward. Whatever the proper interpretation of those cases, certain language in *Walsh* could easily be expanded upon by our courts if we do not make our disapproval clearer. Indeed, I believe this was the case in *Danforth*, which, despite first explaining the analysis is one considering the totality of the circumstances, went on to cite *Walsh* for the proposition that, where a defendant " 'can establish that he had no notice of the criminal investigative purpose of the blood test, his consent would be invalid.' " *Danforth*, at 1023 (quoting *Walsh*, at 773).

This overstates the rule in two ways, and such overstatement should be expressly rejected herein. First, it implies a defendant must have a subjective knowledge of the purpose of the search, an issue properly rejected by the majority. Second, when read in isolation from the balance of *Walsh*, it implies objective awareness of the purpose of the test is an absolute requirement for valid consent. While the majority correctly notes "this Court has been clear that no one fact or circumstance can be talismanic in the evaluation of the validity of a person's consent[,]" Majority Op., at 234, 77 A.3d at 572 (citing *Commonwealth v. Gillespie*, 573 Pa. 100, 821 A.2d 1221,

1225 n. 1 (2003); *Commonwealth v. Smith,* 470 Pa. 220, 368 A.2d 272, 277 (1977)), I would directly address and dispel the above-quoted language from *Walsh.*

The majority states: "Accordingly, to the extent the Superior Court held that police officers must explicitly inform drivers consenting to blood testing that the results of the test may be used against them in criminal prosecutions in order for the consent to be valid, it went too far." *Id.* Not only did the Superior Court err here by requiring a police warning of the purpose of the test before consent can be deemed valid, but its prior holdings implying such an understanding (even an objective one gleaned without an explicit warning) is required for valid consent were also in error. Rather, an objective understanding of the purpose of the test is merely one element a court may consider when analyzing the voluntariness of consent under the totality of the circumstances, just as one's knowledge of the right to refuse consent is merely a single factor to be considered, and not a requirement.