J-A24033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : | |
| v. | : : : | |
| KENNETH M. SCHUEBEL | : | No. 2323 EDA 2022 |

Appeal from the Order Entered August 16, 2022
In the Court of Common Pleas of Northampton County
Criminal Division at No(s):  CP-48-CR-0001578-2021

BEFORE:  STABILE, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED MARCH 15, 2024**

The Commonwealth appeals from the order granting Kenneth Schuebel's ("Schuebel") motion to suppress evidence.[1]  After careful review, we affirm.

On June 20, 2020, Schuebel fatally struck a woman with his SUV.  He gave a blood sample which disclosed the presence of amphetamine, methamphetamine, and a metabolite of marijuana in his system at the time of the fatal collision.  Police charged Schuebel with homicide by vehicle while DUI and related offenses.  Following a preliminary hearing, Schuebel filed a motion to suppress the results of the blood sample.

The court conducted a hearing on Schuebel's suppression motion. Hellertown Police Officer Dominick Fragano ("Officer Fragano"), the only

---

[1] The Commonwealth is permitted to appeal as of right from an order that does not end the entire case where, as here, it certifies that the order "will terminate or substantially handicap the prosecution."  Pa.R.A.P. 311(d).

witness at the hearing, testified that, sometime after 3:00 p.m. on June 20, 2020, he and his partner, Officer Kevin McCartney ("Officer McCartney") (collectively, "the officers") were called to the area of Linden and Main Streets, the scene of the fatal collision. *See* N.T., 3/16/22, at 6-9. The officers were in uniform in a marked patrol car and arrived quickly at the scene. *See id*. at 8, 12. When Officer Fragano asked who was involved in the accident, people at the scene identified Schuebel and the white GMC Envoy he drove. *See id*. at 9, 16.

Officer Fragano found the victim, seventy-four-year-old Frances Miller ("Ms. Miller"), lying against the curb on Main Street, unresponsive, and breathing shallowly; her leg was lacerated and body tissue and blood lay on the ground beside her. *See id*. at 10-12. Schuebel had struck her in the crosswalk. *See id*. at 17. Officer Fragano approached Schuebel and asked if he was involved in the collision; Schuebel said he hit Ms. Miller with his SUV. *See id*. at 15. Officer Fragano asked for Schuebel's "credentials" and having received them told Schuebel he would be back to talk to him. *Id*. After checking on Ms. Miller, Officer Fragano returned and told Schuebel Ms. Miller was badly injured and would likely die.[2] Officer Fragano testified Schuebel was "shaken up," which he demonstrated at the suppression hearing by imitating trembling hands. *Id*. at 15-16, 30, 54-55. Schuebel did not smell

---

[2] Ms. Miller died three days after Schuebel hit her. *See* N.T., 3/16/22, at 7.

of alcohol or display any indicia of intoxication.  *See id*. at 58-59.  Officer

Fragano did not believe Schuebel had been drinking but asked him if he would

be willing to give a blood sample to show there was "nothing in his system."

*See id*. at 16, 18.  Schuebel replied, "Yeah, okay." *See id*. at 19.[3]  The officer

did not administer field sobriety tests because he saw Schuebel shaking and

believed he would fail the tests.  *See id*. at 17.

Schuebel, who was uninjured, agreed to give a blood sample and to be

taken to St. Luke's Hospital.  Schuebel walked to the patrol car and rode,

unrestrained, in the back seat[4] to the hospital ten to twenty minutes away.

He remained nervous.  *See id*. at 19-21, 51.

Officer Fragano testified that before they entered the hospital, he read

Schuebel a police consent form "basically verbatim" from his computer screen.

*See id*. at 22-25.[5]  Schuebel said he had not been drinking.  Officer Fragano

told him the blood sample would show he had nothing in his system and "help

him down the road with the accident." *See id*. at 28.  The officer told Schuebel

---

[3] On cross-examination, Officer Fragano stated that at the preliminary hearing, he testified he told Schuebel he "should" take the test.  *See* N.T., 3/16/22, at 47.

[4] Schuebel's SUV was impounded.  *See* N.T., 3/16/22, at 62-63.

[5] At the start of the suppression hearing, the Commonwealth informed the court it had determined Schuebel did not *sign* a consent form prior to the blood draw as Officer Fragano had testified at the preliminary hearing.  *See* N.T., 3/16/22, at 4-5, 24-25.

again there was a good chance Ms. Miller would not survive. *See id*. at 30. The officer did not discuss a possible criminal investigation at that time, nor did he threaten a license suspension or other consequence if Schuebel refused consent. *See id*. at 31-32, 62. Schuebel entered the hospital with Officer Fragano to have his blood drawn. *See id*. at 22-25.

Officer Fragano testified that before Schuebel signed the form, a hospital employee directed the officer to check a box on a hospital form next to language that stated:

> As a law enforcement officer, I ask that a physician or other authorized person at St. Luke's [] take a blood sample . . ..
>
> The individual has been lawfully arrested or I have made a determination that there is probable cause that the individual has been operating a motor vehicle under the influence of alcohol or a controlled substance . . ..

*See* N.T., 3/16/22, at 64. Officer Fragano testified he did not read that language before checking the box. He testified that he checked the box before Schuebel signed the form, *see id*. at 64-66, but later testified he did **not** check the box. *See id*. at 68-69, 70, 74-75, 85.[6]

Schuebel read and signed the hospital form before giving the blood sample. *See id*. at 26-27. When the blood was drawn and packaged at

---

[6] Officer Fragano also testified he did not read the language that appeared beside the box to Schuebel and did not know if the hospital had done so, although he was with Schuebel at the time. *See id*. at N.T., 3/16/22, at 67. Officer Fragano testified although he had taken fifty to one hundred people to the hospital to give blood samples, he was not aware the hospital form had an alternate box that did not assert the existence of probable cause. *See id*. at 77-84.

approximately 5:15 p.m., Officer Fragano took it and Schuebel back to police headquarters and placed the blood in a locked refrigerator. *See id*. at 32-33.

Schuebel remained at the police station, unhandcuffed and in an unlocked room, for one and one-half to two hours. Officer Fragano read Schuebel ***Miranda*** warnings because, as he told Schuebel, he was going to ask, "guilt seeking questions." Officer Fragano also told Schuebel his blood would be tested for alcohol or narcotics. *Id*. at 33-34, 39-40. During the interview, Schuebel, a carpenter, said he was not under the influence of narcotics, and signed a police consent form consenting to the taking of his blood which had already occurred. *See id*. at 36-38, 41. Schuebel also wrote and signed a document stating he had offered to have his blood drawn and added, "Done Voluntary [sic]." *See id*. at 37.[7]

The suppression court held the matter under advisement at the conclusion of the hearing. Following subsequent briefing, in August 2022, the court granted suppression of the blood test results. The Commonwealth filed a timely notice of appeal. Both the Commonwealth and the suppression court complied with Pa.R.A.P. 1925.

---

[7] Officer Fragano testified had Schuebel withdrawn consent, he would have destroyed the blood sample. *See* N.T., 3/16/22, at 57-58.

The Commonwealth submits the following issue for this Court's review:

Did the suppression court err in finding that [Schuebel] did not voluntarily consent to a blood draw?

Commonwealth's Brief at 4.

The Commonwealth's issue implicates the grant of a defendant's motion to suppress. When the Commonwealth appeals a suppression order, this Court considers only the evidence from the defense witnesses together with the evidence of the prosecution that when read in the context of the entire record remains uncontradicted. *See Commonwealth v. Dales*, 820 A.2d 807, 812 (Pa. Super. 2003). A reviewing court is bound by the lower court's findings of fact if they are supported in the record but conducts plenary review to determine if the court properly applied the law to the facts. *See Commonwealth v. Dunkins*, 263 A.3d 247, 252 (Pa. 2021); *Dales*, 820 A.2d at 812. The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the suppression court. *See Commonwealth v. Dutrieville*, 932 A.2d 240, 242 (Pa. Super. 2007). If the facts support the suppression court's findings, those findings are binding, and this Court may only reverse if the suppression court drew erroneous legal conclusions from the evidence. *See id*.

The Commonwealth bears the burden at a suppression hearing to establish the challenged evidence was not obtained in violation of the accused's rights. *See* Pa.R.Crim.P. 581(H). The taking of blood is a search subject to the protections of the Fourth Amendment of the United States

Constitution and Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Smith*, 77 A.3d 562, 566 (Pa. 2013). Warrantless searches are generally presumed to be unreasonable and therefore unconstitutional. *See Commonwealth v. Boyd*, 296 A.3d 1270, 1274 (Pa. Super. 2023). Voluntarily given consent constitutes an exception to the warrant requirement. *See Commonwealth v. Evans*, 153 A.3d 323, 327-28 (Pa. Super. 2016).

Consensual searches are examined objectively under a totality of the circumstances test to determine if the consent was the product of "an essentially free and unconstrained choice." *Smith*, 77 A.3d at 569 (citation omitted). "[N]o one fact, circumstance, or element of the examination of a person's consent has talismanic significance." *Id*. (citation omitted). An evaluation of the circumstances relating to consent considers "the maturity, sophistication and mental or emotional state of the [consenting party]." *Smith*, 77 A.3d at 573 (citation omitted). Other factors courts consider in determining the validity of consent include:

> 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including the degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

- 7 -

*Commonwealth v. Benitez*, 218 A.3d 460, 480 (Pa. Super. 2019) (citation omitted). Consent for a search "may not be gained through stealth, deceit or misrepresentation, and . . . if such exists, this is tantamount to implied coercion." *Smith*, 77 A.3d at 573 (citation omitted); *accord Commonwealth v. Haines*, 168 A.3d 231, 235 (Pa. Super. 2017) (stating determining the scope of consent is necessary to distinguish between valid consent and consent resulting from coercion, deceit, or misrepresentation). Additionally, that a suspect is not warned that blood draw results may be used in a criminal investigation does not itself render consent involuntary. *See id*. at 571-72 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973) (stating that "it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning")).

The Commonwealth contends the suppression court erred in finding Schuebel did not freely consent to the blood draw. It asserts Officer Fragano encountered Schuebel in the daytime, in public, shortly after the collision; did not use force against Schuebel, who immediately consented to give a blood sample; and did not display a weapon, act aggressively, raise his voice, or threaten or promise anything in exchange for Schuebel's consent. *See* Commonwealth's Brief at 11-12. It further asserts Schuebel went willingly to the hospital, was not handcuffed or arrested, did not ask any questions, or withdraw his consent, was read a form the hospital checked informing him of his right to refuse consent, and signed a hospital consent form. *See id*. at

12-14. The Commonwealth further asserts Schuebel waived his **Miranda** rights and handwrote a statement asserting his consent to the blood test. **See id**. at 13-14. It asserts there was no testimony Schuebel was still "shaken up" at the hospital or police station and the video of his interview shows him to be calm. **See id**. at 14 n.8.

The Commonwealth also raises challenges to the suppression court's factual findings. It states the suppression court failed to determine whether Officer Fragano read the consent form to Schuebel in the patrol car before entering the hospital, erred in finding Officer Fragano checked the box on the hospital form asserting the existence of probable cause, erred in finding Officer Fragano failed to warn Schuebel **before** the blood sample the results could be used in a criminal investigation, and failed to address Schuebel's written consent after he was read his **Miranda** rights. **See id**. at 15-17.

The suppression court made the following findings of fact, *inter alia*:

> 7. Officer Fragano advised [Schuebel] that [Miller] was badly injured and that she might die.
>
> 8. Officer Fragano observed that [Schuebel] was "shaken up" and was visibly shaking.
>
> * * * * *
>
> 10. Officer Fragano told [Schuebel] that the blood test would "help him out down the road."
>
> 11. Prior to making the blood draw request, Officer Fragano did not smell alcohol on [Schuebel] and "did not think he was drinking."
>
> * * * * *

- 9 -

13. At the time he made the blood draw request, Officer Fragano did not suspect that [Schuebel] was under the influence or impaired.

14. Officer Fragano never told [Schuebel] that he could refuse to submit to the blood test.

* * * * *

17. During the trip to the hospital, Officer Fragano observed that [Schuebel] was nervous and shaken up.

18. Officer Fragano testified that he read a Search and Seizure Consent form to [Schuebel] from the computer screen in his patrol unit.

19. **Even if this happened prior to the blood draw, which this Court is not prepared to find**, that form does not apply to a blood draw but, rather, to the search of a residence, building, or premises for physical evidence.

* * * * *

21. The [r]equest for [l]egal [b]lood and/or [u]rine [t]esting form was signed by Officer Fragano.

22. On that form, Officer Fragano checked the box which states:

* * * * *

> The individual has been lawfully arrested or I have made a determination that there is probable cause that the individual has been operating a motor vehicle while under the influence of alcohol or a controlled substance in violation of Pennsylvania law.

23. [Schuebel] reviewed and signed the [hospital] form prior to having his blood drawn.

24. **After** the blood was drawn, Officer Fragano told [Schuebel] that the blood could be sent out to a lab as part of a criminal investigation depending on the outcome of [Miller's] condition.

25. Officer Fragano did not give [Schuebel] this same warning prior to the blood draw.

* * * * *

28. Testing revealed that [Schuebel's] blood did not contain alcohol.

29. However, [Schuebel's] blood contained amphetamine, methamphetamine, and an inactive metabolite of marijuana.

Suppression Court Opinion, 8/16/22, at 2-5 (some emphasis added; record citations omitted).

The suppression court drew the legal conclusion, based on the totality of the circumstances, that Schuebel's consent resulted from "subtle coercion and misrepresentation and [was not] the product of an essentially free and unconstrained choice." Suppression Court Opinion, 8/16/22, at 9. In reaching that conclusion, the court highlighted Schuebel appeared to be in a state of shock and was emotionally distraught and visibly shaking; Officer Fragano implied it was in Schuebel's best interests to have his blood drawn; Schuebel remained emotionally distraught at the hospital where he signed a form indicating he had been lawfully arrested; and Officer Fragano never told Schuebel he was free to refuse to give a blood sample. *See id*. at 8-9.

The record supports the suppression court's finding that: (1) Schuebel was visibly shaking after striking Miller, so visibly that Officer Fragano declined to administer a field sobriety test he believed Schuebel would fail because he was "shaking" and the officer did not think he would pass the test, *see* N.T., 3/16/22, at 17; (2) Officer Fragano did not tell Schuebel he could refuse to give blood but told him that it could help him "down the road" to do so, *see id*. at 28; and (3) Officer Fragano never read Schuebel a consent form *before* the blood draw and did not warn him before the blood draw that the results

could be used in a criminal proceeding, *see id*. at 32. The record also demonstrates Schuebel remained shaken for a long time after the accident, and Schuebel did not sign a police consent form until *after* the blood draw. *See* N.T., 3/16/22, 36-38, 41. Although it is correct, as the Commonwealth states that the failure to advise a suspect that blood test results may be used against him is not dispositive of consent, *see Smith*, 77 A.3d at 571-72, Schuebel also was not told that he was free to refuse the test and was free to leave, was in a weakened emotional state, and was made to sign a hospital form on which Officer Fragano had checked a box stating that there was probable cause for Schuebel's arrest. *See Benitez*, 218 A.3d at 480. The totality of those circumstances, including that Officer Fragano did not tell Schuebel he was free to leave and he could withhold consent and that the results of the blood draw could be used in a criminal investigation, supports the suppression court's conclusion of law. *See Commonwealth v. Haines*, 168 A.3d at 235.[8]

_____

[8] Additionally, the record does not support the Commonwealth's factual averments. Officer Fragano did not read Schuebel a consent form **before** the taking of the blood sample at the hospital as the Commonwealth claims. *See* Commonwealth's Brief at 13. The suppression court stated that it was **not** prepared to find that the warning was read to Schuebel. *See* Suppression Court Opinion, 8/16/22, at 4. Nor does the record support the assertion "[a] hospital employee checked the [box on the form indicating the existence of probable cause]." *See* Commonwealth's Brief at 13. Although Officer Fragano later changed his testimony, he first testified **he** checked the box, *see* N.T., 3/16/22, at 64, 66, and the suppression court found that version of Officer Fragano's testimony credible. *See* Suppression Court Opinion, 8/16/22, at 4. *(Footnote Continued Next Page)*

The suppression court's factually supported findings are binding; to the extent the Commonwealth asserts facts contrary to those the trial court found, this Court is not permitted to make its own credibility or factual determinations. *See Dunkins*, 263 A.3d at 252; *Dales*, 820 A.2d at 812.[9]

Since the binding facts support the suppression court's legal findings, and because we do not discern error in the suppression court's ruling, we are constrained to affirm the trial court's grant of suppression.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/15/2024

_____

Regardless, it is undisputed the box, which asserted the existence of probable cause, was checked **before** Schuebel read and signed the form.

[9] Moreover, the Commonwealth offers no case law to show that Schuebel's retroactively consent to the blood draw, after transportation to the police station and the administration of **Miranda** rights, renders the consent uncoerced.