J-S06012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                             :          PENNSYLVANIA
                             :
          v.                  :
                             :
                             :
LAMAR CALDWELL              :
                             :
          Appellant          :    No. 160 EDA 2017

Appeal from the Judgment of Sentence July 6, 2016
In the Court of Common Pleas of Bucks County Criminal Division at No(s):
CP-09-0006260-2015,
CP-09-0008162-2015

BEFORE: BOWES, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                  **FILED JUNE 1, 2018**

Lamar Caldwell appeals from the judgment of sentence of an aggregate term of twenty to forty years imprisonment following his convictions of, *inter alia*, two counts of burglary at the respective docket numbers indicated above. We affirm.

The trial court offered the following summary of the facts underlying the two cases.

> On August 10, 2015, at approximately 9:30 a.m., [Appellant] appeared at the Santos home on Cheltenham Drive in Bensalem, Bucks County. [Appellant] rang the doorbell at the front door. He waited a period of time and when there was no response, he rang the doorbell a second time. Again he waited a period of time. When there was no response, [Appellant] pounded on the door. During this period of time, Mrs. Santos looked out a second-floor window and saw [Appellant]. [Appellant] then walked to the side of the house. While there, he was observed by Mrs. Santo's [fifteen]-year-old daughter ("S.T.") from the window of her second-floor bedroom. Mrs.

Santos then looked out windows at the back of her home and saw [Appellant] behind the house. He was walking in the direction of a parking lot located behind her property. As he was walking away, [Appellant] looked back at the residence twice.

One week later, on August 17, 2015, at approximately 9:30 a.m., [Appellant] again approached the Santos residence. On this occasion, Mrs. Santos was not home. Mr. Santos was asleep in his second-floor bedroom. S.T. and her five-year-old brother were on the second floor as well. [Appellant] rang the front door bell. He waited a period of time and when no one responded, he banged on the door. S.T. looked out the upstairs windows to see if she could see who was at the door. When she didn't see anyone, she went down stairs, looked out the "peephole" on the front door and again saw no one. She then went to the side door where she saw the silhouette of a man through the shade on the door. She also saw a gloved hand holding a round glass-like object through the panel of windows on the side of the door. She immediately looked to see if the door was locked. When she saw that the deadbolt was not engaged, she crouched down, went to the door, sat down and pushed her weight against the door to prevent the man from entering. She then felt the individual pushing against the door and heard the handle move. When the pressure being exerted against the door subsided, she engaged the deadbolt and went upstairs to get her father.

Mr. Santos testified that he was asleep after just having come home from work when he was awakened by S.T. who was in tears. Before he could get downstairs to see what [was] happening, he heard loud banging. Mr. Santos went to the front door, looked out the peephole and saw [Appellant]. He did not answer the door. He then saw [Appellant] walk to the neighbor's house next to his and then walk back across his property to the neighbor's residence on the other side. The next time Mr. Santos saw him, [Appellant] was at the side door of his residence looking through the side glass panel. Mr. Santos watched as [Appellant] tried to force the door open with his body. Mr. Santos then called 911.

Officer Scott Merchiore of the Bensalem Police Department arrived on scene within two minutes and found [Appellant] at the side entrance of the home. White knit gloves were found in his pants pocket. [Appellant] told Officer Merchiore that he was

looking for work. There was no work truck or vehicle on the street. Detective Gregory Jackson and Detective Jack Gohl of the Bensalem Police Department also responded to the scene and canvassed the neighborhood. None of the neighbors indicated they had spoken to [Appellant].

Detective Jackson and Detective Gohl later interviewed [Appellant]. During that interview, [Appellant] gave a false address. He also gave false information about why he was in Bensalem and how he had arrived there. [Appellant] told the detectives that he did not drive, did not have a car and did not have a driver's license. He stated that he took the bus to Bensalem that morning from the Frankford terminal in Philadelphia arriving at Byberry Road in Bensalem after 9:00 a.m. He stated that he then walked to Street Road to look for work. When asked where he had inquired as to possible employment, [Appellant] told the detectives he had only been to one business because the rest of the businesses in the area were closed. Detective Jackson testified that, contrary to [Appellant]'s assertion, most businesses on Street Road and between Byberry Road and Street Road are open before 9:00 a.m. Subsequent investigation also revealed that [Appellant] did not travel by bus to Bensalem but rather had driven his daughter's car to Bucks County and had left it parked in a parking lot located behind the Santos property. [Appellant] also advised the detectives that he had been to Bensalem only once or twice before and that on both occasions it was to the Golden Corral restaurant. When confronted, [Appellant] admitted that he had been at the Santos residence the week before his arrest. [Appellant] further claimed he was at the Santos'[s] residence because the property appeared to need lawn care. Detective Jackson testified that the grounds did not need lawn care and that [Appellant] admitted that he did not have any lawn care equipment with him.

During this interview, Detective Jackson obtained a DNA buccal swab from [Appellant] and sent the sample to a DNA laboratory for analysis. [Appellant]'s DNA profile was developed from this sample. That profile was later compared to a DNA sample taken from a Coca Cola bottle found at the scene of the Czach burglary several weeks before.

The Czach burglary occurred on July 29, 2015. At approximately 3:20 p.m. that date, Gabriella Czach returned to her home on Buttonwood Avenue in Bensalem, Bucks County

and discovered that her home had been burglarized after she and her husband had left the residence that morning. Damage to the front door proved that an unsuccessful attempt had been made to enter the residence through the front door. A garden border stone taken from the back yard was then used to smash the rear sliding glass door, allowing entry into the home. When the [owners] entered the residence, they found that their home had been ransacked; items had been removed from where they had been stored and were strewn about. Various pieces of electronic equipment and jewelry had been taken. The value of the stolen items and the cost to repair the damage totaled $13,660.23

An open bottle of Coca Cola was found on the floor of the living room. Detective Leith of the Bensalem Township Police Department swabbed the mouth of the bottle with a DNA swab. This sample was later compared to [Appellant's] DNA profile. DNA analysis subsequently revealed that the DNA found on the soda bottle matched [Appellant's] DNA profile. . . .

Trial Court Opinion, 6/23/17, at 2-6 (footnotes omitted).

Appellant was arrested at the Santos home and charged with attempted burglary and related charges on August 17, 2015, in case number 6260 of 2015. On December 9, 2015, Appellant was charged with a burglary and related offenses as a result of the DNA match at case number 8162 of 2015. The cases were consolidated for a jury trial, after which Appellant was convicted of, *inter alia*, burglary and attempted burglary. Following a presentence investigation, Appellant was sentenced to consecutive terms of ten to twenty years imprisonment. Appellant filed a timely notice of appeal following the denial of his post-sentence motion, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following questions to this Court for review, which we have re-ordered for ease of disposition.

I.       Whether the trial court erred by denying suppression of the Appellant's DNA evidence?

II.      Whether the trial court erred by admitting the Appellant's DNA evidence during the Appellant's trial, where the DNA evidence was previously suppressed and/or suppression was considered moot because the Commonwealth conceded that they will not introduce DNA evidence?

III.     Whether the Appellant's warrantless DNA sample was obtained in violation of [his] Pennsylvania constitutional rights, and his United States 4th Amendment rights under *Birchfield v. North Dakota*, as a significantly intrusive test obtained without a warrant, and where his consent was unlawful, coerced, involuntary, and unreasonable?

IV.      Whether the trial court erred by presenting an instruction to the jury concerning the Appellant's absence from the trial, where the instruction was prejudicial against the Appellant, and commented on the Appellant's character, credibility, and truthfulness?

V.       Whether the trial judge erred in failing to recuse herself, where the trial judge was previously involved in the prosecution of the Appellant when she was in the Bucks County District Attorney's Office in 1994-1995 (#5486-1994)?

VI.      Whether the trial court abused its discretion in sentencing the Appellant to a sentence which exceeded the standard and aggravated guideline ranges for the burglary and attempted burglary?

Appellant's brief at 9 (unnecessary capitalization omitted).

We begin with Appellant's claims regarding the suppression of evidence, mindful of the following.

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining

whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa.Super. 2017) (cleaned up).

The trial court offered the following summary of the procedural history of Appellant's suppression motions.

The [trial court held a suppression hearing] in the Santos attempted burglary case (Criminal Information 6260 of 2015) on November 30, 2015. At the time of that hearing, [Appellant] had not yet been charged with the burglary of the Czach residence. At the outset of the hearing, counsel for [Appellant] supplemented his motion to suppress [Appellant's] statement to police with an oral motion to suppress any DNA evidence obtained by the Commonwealth as a result of receiving the DNA sample from [Appellant]. In response to the defense counsel's oral motion, the Commonwealth advised the court that it would not be seeking to introduce DNA evidence in the Santos case, rendering any challenge to the admissibility of DNA evidence at that stage moot.

Subsequently, [Appellant] was charged with the burglary of the Czach residence when [Appellant's] DNA, obtained from the sample [he] gave following his arrest for the Santos attempted burglary, was determined to match DNA found at the Czach crime scene. (Criminal Information 8162 of 2015). On

- 6 -

> December 28, 2015, the Commonwealth moved to consolidate the two cases.  In light of the new evidence, the Commonwealth sought to introduce the DNA evidence in the consolidated trial.  On January 15, 2016, a hearing was held to determine whether [Appellant's] consent to provide the DNA sample was voluntary.  By order dated January 29, 2016, [Appellant's] motion to suppress [his] DNA sample, the analysis performed on that sample and the results of the comparison of [his] DNA to the DNA found at the Czach crime scene was denied.

Trial Court Opinion, 6/23/17, at 8-9 (footnotes and unnecessary capitalization omitted).

Appellant first contends that the DNA evidence should have been suppressed because he had relied upon the trial court's "final determination on his motion to suppress his DNA evidence" made in the Santos case on November 30, 2015, which was not appealed by the Commonwealth within 30 days as required by Pa.R.Crim.P. 1005(c).  Appellant's brief at 26-27.

Appellant's argument is fatuous.  The court made no decision as to DNA evidence at the November 30, 2015 hearing.  The court expressly stated that there was no issue before it concerning DNA evidence, as the Commonwealth's indication that it was not introducing the evidence rendered the issue moot.  Trial Court Opinion, 6/23/17, at 9 (citing N.T. Suppression (Santos case), 11/30/15, at 35).  Hence, there was no trial court decision to appeal under Rule 1005(c).

Moreover, the Commonwealth's representation regarding the DNA evidence was made in the Santos case, before Appellant had been identified as the Czach burglar, let alone charged with any crimes related to the

- 7 -

Czachs' residence. Appellant offers no explanation why the Commonwealth's decision about foregoing DNA evidence made on November 30, 2015, in relation to the Santos case (6260 of 2015), should have any effect on its ability to pursue that evidence in the Czach case (8162 of 2015), which was initiated by criminal complaint filed on December 8, 2015. This argument merits no relief.

Appellant next asserts that the DNA evidence should have been suppressed as involuntary because his consent "was given under the guise that the police were excluding him from being a sexual predator." Appellant's brief at 25. He maintains that the detective's "misrepresentation" about the reason for giving a sample "nullified" the consent. *Id*. Appellant further insists that the detective's indication that the sample would be used for "investigative purposes" was insufficient for obtaining valid consent. *Id*. at 26.

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies. Exceptions to the warrant requirement include the consent exception. . . .

*Commonwealth v. Kurtz*, 172 A.3d 1153, 1159 (Pa.Super. 2017) (internal citations and quotation marks omitted).

> In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice— not the result of duress or coercion, express or implied, or a will

overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

***Commonwealth v. Smith***, 77 A.3d 562, 573 (Pa. 2013) (internal citations and quotation marks omitted).

The trial court addressed the voluntariness of Appellant's consent as follows.

The challenged DNA sample was obtained during [Appellant's] interview with Detective Jackson and Detective Gohl on August 17, 2015. Prior to that interview, Detective Jackson advised [Appellant] of his ***Miranda***[ ***v. Arizona***, 384 U.S. 436 (1966),] rights, reading verbatim from a pre-printed ***Miranda*** warnings card. [Appellant] acknowledged, in writing, that he understood each right and agreed in writing to speak to the detectives without a lawyer being present. [Appellant] signed the card at 11:30 a.m.

The interview lasted approximately one hour, maybe less. At no time during the interview did [Appellant] indicate that he wanted to speak to a lawyer or that he no longer wished to speak to the detectives. The detectives were dressed in plain clothes and were not carrying their service weapons. [Appellant] was not threatened, coerced or promised anything in order to induce him to make a statement against his will.

During the course of the interview, Detective Jackson asked [Appellant] if he would voluntarily consent to provide a DNA sample using a buccal swab. Detective Jackson explained to [Appellant] that the swab would be used to obtain [his] DNA profile and that his DNA profile could be used for investigation purposes. Detective Jackson told [Appellant] that he did not

have to consent. Prior to submitting his DNA, [Appellant] read, signed and dated the following consent provision:

> I, [Appellant], freely and voluntarily consent to provide a DNA swab sample to only be used for the purpose of criminal investigation. I have been advised that I have a right to refuse permission to obtain samples at any time. If I do refuse, I know the Officer may apply for a search warrant or court order prior to obtaining the samples. I know that any evidence seized may be used against me in a criminal prosecution.

> After [Appellant] gave his consent, he was handed two buccal swabs. He removed the swabs from their packaging and swabbed his own mouth.

> . . . .

> There was no evidence that [Appellant] was in any way coerced or improperly induced to provide a DNA sample. [Appellant] was told that the DNA sample would be used for purpose of criminal investigation and that the sample could be used against him in a criminal prosecution. He was told that he had a right to refuse to provide a sample. Considered the totality of the circumstances, th[e trial c]ourt found that [Appellant's] consent was the product of an essentially free and unconstrained choice-not the result of duress or coercion, express or implied, or a will overborne and was therefore voluntary.

> The fact that the evidence ultimately incriminated [Appellant] in another criminal offense does not alter the conclusion that his consent was voluntary. Detective Jackson was not involved in the investigation into the Czach burglary and is there is no evidence that [Appellant] was deceived as to the potential use of the DNA sample.

Trial Court Opinion, 6/23/17, at 10-11.

The trial court's factual findings are supported by the record, and we discern no error of law. Thus, we have no reason to disturb the trial court's determination that Appellant's consent was validly obtained. *See*, *e.g.*,

- 10 -

*Commonwealth v. Smith*, 77 A.3d 562, 573 (Pa. 2013) (holding trial court properly denied suppression motion because defendant's consent was voluntary, although officer did not advise the defendant of the full criminal ramifications of the blood draw following car accident, where the defendant was informed of his right to refuse and a reasonable person in the defendant's position "would have contemplated the potentiality of the results being used for criminal, investigative, or prosecutorial purposes").

In his last suppression argument, Appellant suggests that the United States Supreme Court's decision in *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016), supports his claim that the consent was invalid. Appellant's brief at 27-28. The *Birchfield* Court held that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Birchfield*, *supra* at 2186. The *Birchfield* decision has no application to the instant case, for, as the trial court aptly noted, "Appellant's consent to the DNA swab was not obtained as a result of a threat that refusal would lead to criminal penalties." Trial Court Opinion, 6/23/17, at 13. Appellant's suppression motion was properly denied on the basis of his voluntary consent.

We next consider Appellant's claim that the trial court erred in giving a curative instruction to the jury that amounted to a prejudicial commentary on "Appellant's character, credibility, and truthfulness." Appellant's brief at

28.  The record supports the following explanation given by the trial court of the incident giving rise to this issue.

> On the second day of trial, while Detective Jackson was testifying and in the presence of the jury, [Appellant] interrupted the proceedings stating, "They're framing me.  That's not my DNA."  [Appellant] told the jury, "They suppressed my DNA."  The outburst continued after the jury was removed from the courtroom.  Following a recess to allow [Appellant] to regain his composure, the court engaged in an extensive colloquy with [Appellant] advising him of his obligation to refrain from such outbursts, his right to be present during trial and his right to remain in the courtroom or return to the courtroom at any time upon his representation to the court that he would refrain from any further outbursts.  [Appellant] advised th[e trial] court that he could not refrain from further outbursts and requested to be removed from the courtroom.

> Th[e trial] court requested proposed curative instructions from the defense and the Commonwealth.  Defense counsel requested that the jury be instructed that [Appellant] chose to absent himself as a less prejudicial alternative to the possible negative inferences that the jury could draw from his absence.

> Pursuant to this request, the jury was instructed as follows:

>> You may notice that the defendant is not in court since the last we heard from Detective Jackson.  He has made a decision to not be present during the course of the remainder of these proceedings.  He can change his mind at any time and return to the courtroom, but he has chosen not to be in the courtroom and so he is not here.

>> I want to make perfectly clear the fact that he is not present is not any evidence against him and you may not consider this as any - - you may not infer anything from his decision to not be present in the courtroom.  It has nothing, absolutely nothing to do with your determination about whether or not the evidence that is presented by the Commonwealth is sufficient to convict him beyond a reasonable doubt

- 12 -

or is not sufficient to convict him beyond a reasonable doubt. I just want to explain because it's been obvious to you that he is not here, but you may not in any fashion hold it against him that he is not here in the courtroom. Your decision and your determination is the same as I told you at the outset of these proceedings.

Following this instruction, defense counsel advised th[e trial] court that he was not requesting any further instructions. The Commonwealth then renewed its request that [Appellant's] misstatement that DNA had been suppressed be corrected and further requested that the jury be instructed that [Appellant's] statements in open court are not testimony. Pursuant to these requests, the jury was instructed as follows:

As you know, the defendant made various statements during the course of the trial immediately before leaving the courtroom. You may have heard him make various statements. I am instructing you now, and you must follow all of my legal instructions, that you are to disregard everything that he said. What he said in this courtroom is not testimony and may not be considered by you as testimony.

There was a reference that this court suppressed the DNA evidence in this case. That is not accurate. The DNA evidence is admissible evidence and may be considered by you in determining whether or not the Commonwealth has met its burden of proof on one or both of these burglary cases, one attempted burglary and one burglary. At the same time the mere fact that the defendant made that statement, again, you cannot hold that against him. And I know comments about the DNA evidence is not evidence in this case, so you cannot - - the evidence is relevant and admissible, but the fact the defendant said something contrary to that is not evidence against him and you may not consider that statement as - - in any fashion in determining whether or not the defendant is guilty or innocent of the crimes charged.

Trial Court Opinion, 6/26/17, at 13-15 (footnotes omitted).

- 13 -

The record reflects that the trial court sought input from both parties on how to instruct the jury regarding Appellant's outburst and subsequent absence, and spent substantial time contemplating the issue. N.T. Trial, 3/15/16, at 17, 24, 33-34. The first instruction was given at the request of Appellant's counsel, and no objection was made to the second instruction that was requested by the Commonwealth. Accordingly, because the trial court was denied the opportunity to consider the objections Appellant now raises concerning the instructions, the issues are waived on appeal.[1] *See Commonwealth v. Rosser*, 135 A.3d 1077, 1086 (Pa.Super. 2016) (*en banc*) ("Trial judges must be given an opportunity to correct errors at the time they are made.") (internal quotation marks omitted); *Commonwealth v. Rodriguez*, 174 A.3d 1130, 1145 (Pa. Super. 2017) ("It is axiomatic that issues not raised in the lower court are waived and cannot be raised for the first time on appeal. The absence of a contemporaneous objection below constitutes a waiver of the claim on appeal.") (internal quotation marks and citations omitted).

_____

[1] To the extent that Appellant argues that his trial counsel improperly requested that the trial court inform the jury that Appellant chose to remove himself from the courtroom, *see* Appellant's brief at 29, we note that claims of ineffective assistance of counsel may be raised in a petition filed pursuant to the Post Conviction Relief Act, not on direct appeal. *Commonwealth v. Woeber*, 174 A.3d 1096, 1109 n.16 (Pa.Super. 2017) (citing *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002)).

Appellant's remaining issues concern his sentence. First, he argues that the trial judge should have recused herself, and that he is entitled to a new sentencing hearing with a different judge. Appellant's brief at 22. The following principles guide our review.

> [Our Supreme] Court presumes judges of this Commonwealth are honorable, fair and competent, and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice. The party who asserts a trial judge must be disqualified bears the burden of producing evidence establishing bias, prejudice, or unfairness necessitating recusal, and the decision by a judge against whom a plea of prejudice is made will not be disturbed except for an abuse of discretion.
>
> As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. . . . This is a personal and unreviewable decision that only the jurist can make.

*Commonwealth v. Kearney*, 92 A.3d 51, 60 (Pa.Super. 2014) (internal citations and quotation marks omitted).

If the judge concludes that he or she can be impartial, "[t]he jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary." *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 89 (Pa. 1998). "Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion." *Kearney*, *supra* at 60.

- 15 -

Here the trial judge made the unreviewable determination that she could be impartial. Appellant, however, maintains that the present case contains an appearance of impropriety because he "is entitled to sentencing by a judge whose impartiality cannot be reasonably questioned." Appellant's brief at 22. Appellant argues as follows.

> In the case *sub*[ ]*judice*, the trial court was previously involved as a district attorney in some aspect of the prosecution of the Appellant in an unrelated matter. She requested that a bench warrant remain outstanding at the Appellant's prior arraignment. She argued on behalf of the Commonwealth directly against the rights of the Appellant. She was an active participant in that prior proceeding. In addition to a showing of actual bias, the concern is a situation where impartiality might be reasonably questioned regardless of the record.

*Id*.

Our Supreme Court has held that there is no "*per se* rule that a judge who had participated in the prosecution of a defendant may never preside as judge in future unrelated cases involving that defendant." **Commonwealth v. Darush**, 459 A.2d 727, 731 (Pa. 1983). "Absent some showing of prejudgment or bias we will not assume a trial court would not be able to provide a defendant a fair trial based solely on prior prosecutorial participation." **Id**. Rather, the question is whether the judge "earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." **Williams v. Pennsylvania**, 136 S. Ct. 1899, 1905 (2016).

The trial court offered the following discussion of her involvement in Appellant's prior case.

> The undersigned was a prosecutor in Bucks County at the time [Appellant] was prosecuted for burglary in case number 5486-1994. The docket in that matter reflects that [Appellant] entered a guilty plea to burglary and related charges on June 19, 1995. The docket further reflects that the only involvement the undersigned had with that matter was an appearance on February 13, 1995 as representative of the Bucks County District Attorney's Office before the Honorable Isaac S. Garb, then Administrative Judge of the Criminal Division, requesting that the bench warrant previously issued at arraignment remain outstanding due to [Appellant's] failure to appear for trial. The undersigned was not the assigned trial attorney. The undersigned has no recollection of having any prior contact with [Appellant]. There is, therefore, no basis to conclude that the undersigned would have been unable to preside over [Appellant] jury trial fairly and impartially. The fact that the undersigned was employed by the District Attorney's Office when [Appellant] was prosecuted does not warrant recusal.

Trial Court Opinion, 6/23/17, at 7 (citation omitted).

Appellant points to no evidence to suggest that the trial judge ever interacted with, met, or even saw him while she was a prosecutor. Nor does he cite authority to support the contention that the trial court's single instance of pinch-hitting for the prosecutor assigned to Appellant's case on a routine motion was indicative of bias or an appearance of impropriety that would cause the public to lose confidence in the judiciary. Accordingly, Appellant has not met his burden of showing that recusal was warranted, and the trial court did not abuse its discretion in denying the recusal motion. *Compare Commonwealth v. Jones*, 663 A.2d 142, 144 (Pa. 1995) (denying motion for Justice's recusal because his name had appeared on

brief seeking affirmance of the petitioner's death sentence filed five years earlier, when the Justice was District Attorney of Philadelphia, where the justice had no personal involvement in the case, there was no indication of prejudgment or bias, and the case law did not suggest that recusal was warranted by any appearance of impropriety), *with Williams*, *supra* at 1907 (holding Justice's decision when district attorney to authorize seeking the death penalty against the defendant was significant personal involvement requiring recusal).

Finally, Appellant seeks our review of the discretionary aspects of his sentence.

> An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors:
>
>> (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

*Commonwealth v. Samuel*, 102 A.3d 1001, 1006-07 (Pa.Super. 2014) (some citations omitted).

While Appellant filed a timely notice of appeal and sought modification of his sentence in his post-sentence motion, he failed to include a statement

of reasons for allowance of appeal in his brief as required by Pa.R.A.P. 2119(f). The Commonwealth has objected to its absence. Commonwealth's brief at 34. "Because the Appellant failed to comply with Pa.R.A.P. 2119(f) and the Commonwealth objected to the omission, this Court may not review the merits of the claim, and we deny allowance of appeal." *Commonwwalth v. Kiesel*, 854 A.2d 530, 533 (Pa.Super. 2004).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/1/18</u>