J-A28016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANTHONY M. SLACK | |
| Appellant | No. 1049 EDA 2019 |

Appeal from the Judgment of Sentence Entered March 22, 2019
In the Court of Common Pleas of Northampton County
Criminal Division at No.: CP-48-CR-0000633-2018

BEFORE:  PANELLA, P.J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 24, 2020**

Appellant Anthony M. Slack appeals from the March 22, 2019 judgment of sentence entered in the Court of Common Pleas of Northampton County ("trial court"), following his negotiated plea of *nolo contendere* to driving under the influence of alcohol ("DUI")—highest rate (.23%) and second offense—under Section 3802(c) of the Vehicle Code ("Code"), 75 Pa.C.S.A. § 3802(c).  Upon review, we affirm.

Following a traffic stop, Appellant was charged with DUI (alcohol)—general impairment, DUI—highest rate, and failure to stop at red signal.[1]  On August 1, 2018, Appellant filed a motion to suppress the results of his blood test, arguing, *inter alia*, that he did not voluntarily consent to blood draw and

_____

[*] Former Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S.A. §§ 3802(a)(1), (c) and 3112(a)(3)(i), respectively.

that, as a result, the blood draw violated his constitutional rights. On August 10, 2018, the trial court conducted a suppression hearing, at which the Commonwealth offered the testimony of Officer Steven Lindstedt and Sergeant Eric Smith of the Wilson Borough Police Department.

Officer Lindstedt testified that he has been a police officer since 1981. N.T. Suppression, 8/10/18, at 4. While on duty in a marked police vehicle on January 14, 2018, a little after 1:00 a.m., he observed a black 2015 Hyundai sedan traveling west on Freemansburg Avenue and approaching the 25th Street intersection. *Id.* at 4-5. According to Officer Lindstedt, although "[t]he vehicle had its right turn signal on," "it went straight through a steady red traffic signal." *Id.* at 5. Officer Lindstedt initiated pursuit. *Id.* Officer Lindstedt described that he activated the emergency lights of the marked police vehicle and ultimately caught up with Appellant. *Id.* Officer Lindstedt testified that there "was no chase or anything like that[.]" *Id.* Describing the traffic stop, Officer Lindstedt testified:

> I stopped the vehicle on 27th Street and Dearborn, a little bit past the initial violation. I called out to the county dispatch center. I approached the vehicle, and the driver was the gentleman seated over there. He was identified as [Appellant], and he had a very, very strong odor of an alcoholic beverage on him. [His eyes were glassy and bloodshot and watery.] I asked him where he was going. He said 25th Street. I said, you know where you're at? And he said—he was unaware of his surroundings. He was from Easton on 9th Street. I asked him where he was coming from. He said he went out to dinner with a girlfriend, and he had a couple of drinks.
>
> So it's 1:00 in the morning, and I decided to ask him to come out of the vehicle to perform field sobriety tests. And that day and hour in January, it was extremely cold. So we didn't perform all the field sobriety tests, but we tried to do the HGN test on him, which is the following of the eyes. He wouldn't cooperate in respect that he kept moving his head. You have to keep your

- 2 -

head straight and just follow with your eyes alone. And we gave him a PBT test, which is a preliminary breath test. Instead of blowing into the straw, he was sucking on the straw. And I had another officer with me, Officer Stout. He became verbally abusive with Officer Stout. And so it was our opinion at that time that he was under the influence of alcohol. So I affected an arrest, and he was transported to the DUI center in Easton.

*Id.* at 6-7 (sic). Officer Lindstedt further recalled that Appellant appeared to be "zoned out" and that he had a "stupor about him." *Id.* at 7. He further testified that at the DUI center, where Appellant's blood was drawn, Appellant's demeanor was "nasty" and Appellant "was loud and disrespectful." *Id.* at 8. Officer Lindstedt explained that Appellant "was making derogatory comments towards my coworker. From my understanding, he was just verbally abusive." *Id.* at 8-9. Finally, Officer Lindstedt testified that the results of Appellant's blood test revealed a blood alcohol content ("BAC") of .23. *Id.* at 9.

On cross-examination, Officer Lindstedt acknowledged that Appellant was "angry" and "argumentative" through the process. *Id.* at 9-10. Officer Lindstedt recalled that Appellant was handcuffed when he was transported to the DUI center. *Id.* at 11. Accordingly to Officer Lindstedt, "at least three or four" officers were working at the DUI center that night. *Id.*

The Commonwealth next called to the stand Sergeant Smith, who testified that he is a police sergeant "with Lehigh University Police and Palmer Township Police and Wilson Police." *Id.* at 12. He also testified that he works at the DUI center in Easton. *Id.* at 12-13. Sergeant Smith described his duties at the DUI centers as follows: "When they first come in, we collect their

information. We read the implied consent form, the DL-26B. If they're willing to do so, we do field sobriety tests and an interview with them." *Id.* at 13. Sergeant Smith further testified that he was on duty at the DUI center on the morning of January 14, 2018. In addition to the officers who brought Appellant to the DUI center, Sergeant Smith recalled that it was him and another officer as well as a phlebotomist who were at the DUI center that night. *Id.* Sergeant Smith further recalled that he wore khaki-colored cargo pants and a Northampton County DUI polo shirt on the night in question. *Id.* at 13-14. Sergeant Smith did not carry any firearms. *Id.* at 14.

Sergeant Smith testified that when Appellant arrived at the DUI center, the officers removed his handcuffs, invited him to sit in the phlebotomy chair and initiated the intake process. *Id.* Sergeant Smith explained that when he interviewed Appellant, he was not in handcuffs or in a holding cell. *Id.* at 14-15. At that time, according to Sergeant Smith, a second officer was with him whose responsibility was to record Appellant's interview. *Id.* at 15. The Commonwealth then introduced the recording of Appellant's interview into the record and played it for the trial court. Recalling Appellant's demeanor, Sergeant Smith testified: "It was argumentative. He was insulting. Personal attacks against the staff. It was terrible behavior." *Id.* at 16-17.

- 4 -

Sergeant Smith testified that he read verbatim to Appellant the DL-26B form, in specific the required parts 1 through 4.[2] *Id.* at 17. Sergeant Smith described Appellant's response to his reading of form DL-26B. "He interrupted. He kind of tried to stall the process and was arguing certain point of it. And then once we thought he was going to sign it, he wanted to go over the whole thing again and read it. And he finally did sign it." *Id.* at 17-18. Sergeant Smith testified that he explained "certain parts of [DL-26B] to him again[.]" *Id.* at 18.

Sergeant Smith testified that Appellant signed the DL-26B form in his presence while Appellant was being video-recorded. *Id.* at 19. Thereafter, the phlebotomist drew Appellant's blood. *Id.* According to Sergeant Smith,

---

[2] DL-26B provides in relevant part:

**It is my duty as a police officer to inform you of the following:**

1. You are under arrest for driving under the influence of alcohol or a controlled substances in violation of Section 3802 of the Vehicle Code.

2. I am requesting that you submit to a chemical test of blood.

3. If you refuse to submit to the blood test, your operating privilege will be suspended for at least 12 months. If you previously refused a chemical test or were previously convicted of driving under the influence, you will be suspended for up to 18 months.

4. You have no right to speak with an attorney or anyone else before deciding whether to submit to testing. If you request to speak with an attorney or anyone else after being provided these warnings or you remain silent when asked to submit to a blood test, you will have refused the test.

Appellant did not need to be restrained during the blood draw. *Id.* at 21. Appellant allowed the phlebotomist to draw his blood. *Id.* Sergeant Smith further testified that, once the phlebotomist drew Appellant's blood, "it [went] downhill." *Id.* at 19. "There was – he seemed to become more agitated and started actually verbally abusing the phlebotomist. And we were done processing at that point. There was nothing productive that was going to come from it." *Id.* Finally, Sergeant Smith testified that Appellant refused to sign the *Miranda*[3] form.[4] *Id.* at 20.

On cross-examination, Sergeant Smith testified that officers at the DUI center do not wear guns and that doors to the DUI center are locked from the outside. *Id.* at 22. Sergeant Smith denied that he argued with Appellant. *Id.* at 24. He clarified that Appellant's blood was drawn within three to five minutes from the time he read and explained to Appellant form DL-26B. *Id.* Sergeant Smith testified that Appellant did not request an attorney. *Id.* Rather, Appellant "just didn't understand why he wasn't entitled to an attorney" as per form DL-26B. *Id.* Sergeant Smith acknowledged that he twice asked Appellant for a "yes or no" answer with respect to form DL-26B.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] When a motorist is arrested for DUI, police inquiry as to whether the suspect will take a chemical test is not an interrogation and no *Miranda* warnings are required. If the driver chooses to refuse, the police can still take a blood draw without violating the defendant's Fifth Amendment right against self-incrimination. *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L.Ed.2d 908 (1966). In those cases, drawing blood requires a search warrant or another exception to the warrant requirement. *See e.g. Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552, 185 L.Ed.2d 696 (2013).

*Id.* Sergeant Smith testified that he explained to Appellant "that he has the explicit right to refuse" to sign form DL-26B. *Id.* at 25. Sergeant Smith recalled that he was "within five feet" of Appellant when the phlebotomist drew his blood. *Id.* at 26. According Sergeant Smith, he feared that Appellant posed a danger to the phlebotomist because of "the comments and things he started to say to her." *Id.* Sergeant Smith denied suggesting to Appellant that he would return home faster if he signed the DL-26B form. *Id.* at 28.

On re-direct, Sergeant Smith testified that the doors to the DUI center were not locked from the inside and "[t]here's actually a sensor. As soon as you get by the door, it unlocks and the person can walk right out." *Id.* at 29.

Following the hearing, on November 21, 2018, the trial court denied Appellant's suppression motion, concluding that Appellant voluntarily consented to the blood draw.

On December 14, 2018, prior to trial, Appellant entered into a negotiated plea of *nolo contendere*. In his written plea colloquy, however, Appellant explicitly noted twice that he "reserves the right to appeal denial of his suppression motion." Written Plea Colloquy, 12/14/18, at 5. The trial court conducted an on-the-record oral colloquy after which it accepted the negotiated plea. On March 22, 2019, consistent with the negotiated plea, the trial court sentenced Appellant to, among other things, 90 days to 5 years in

Northampton County prison. Appellant timely appealed.[5] The trial court

directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained

of on appeal. Appellant complied, challenging the denial of his suppression

motion. In response, the trial court issued a Pa.R.A.P. 1925(a) statement

wherein it incorporated its November 21, 2018 order denying Appellant's

suppression motion.

On appeal, Appellant raises a single issue for our review.

[I.] Whether the court erred in refusing to suppress the results of [] Appellant's warrantless blood draw where [] Appellant was coerced into the blood draw by being uncooperative, repeatedly demanding to be released, repeatedly demanding counsel and physically resisting the drawing of blood.

Appellant's Brief at 5 (unnecessary capitalizations omitted).

In reviewing appeals from an order denying suppression, our standard

of review is limited to determining

whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains

_____

[5] This appeal is proper under **Commonwealth v. Singleton**, 169 A.3d 79 (Pa. Super. 2017), where, as here, the defendant attempted to enter a conditional plea agreement by reserving the right to appeal the trial court's suppression order. We noted that "[w]hile our courts have not specifically addressed the validity of conditional plea agreements, our courts have proceeded to review the merits of issues specifically reserved in plea agreements. **Id.** at 81-82 (discussing cases). In **Singleton**, therefore, we reached the merits of the appellant's suppression claim because "the trial court accepted [the appellant's] conditional plea agreement reserving the right to appeal the denial of his suppression motion." **Id.** at 82. This instant case is indistinguishable from **Singleton** and compels the same outcome because the trial court accepted Appellant's *nolo contendere* plea wherein he explicitly reserved his right to challenge the suppression ruling.

uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Griffin*, 116 A.3d 1139, 1142 (Pa. Super. 2015). Our scope of review is limited to the evidence presented at the suppression hearing. *In re interests of L.J.*, 79 A.3d 1073, 1088-89 (Pa. 2013).

In *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016), the Supreme Court addressed the constitutionality of warrantless searches of breath and blood under the Fourth Amendment, specifically with regard to the search-incident-to-arrest and consent exceptions to the warrant requirement. *Id.* at 2184. The Court held, *inter alia*, that "the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving[,]" but "reach[ed] a different conclusion with respect to blood tests." *Id.* Because obtaining a blood sample is significantly more intrusive than a breath test, the Court determined that a blood test may not be administered as a search incident to arrest.[6] *Id.* at 2185.

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless

---

[6] Sergeant Smith in this case used form DL-26B, which did not contain any threats to impose enhanced criminal penalties on Appellant for refusing to submit to a blood test. Thus, our current scheme of civil and evidentiary penalties, as set forth in 75 Pa.C.S.A. § 1547(b)(1) and (e), is not precluded by *Birchfield*. *See Commonwealth v. Johnson*, 188 A.3d 486, 490 (Pa. Super. 2018) ("[T]he threat of civil penalties and evidentiary consequences is permissible under the implied consent laws; however a threat of added criminal sanctions is not.").

an established exception applies." ***Commonwealth v. Strickler***, 757 A.2d 884, 888 (Pa. 2000). "Exceptions to the warrant requirement include the ***consent exception***, the plain view exception, the inventory search exception, the exigent circumstances exception, the automobile exception . . ., the stop and frisk exception, and the search incident to arrest exception." ***Commonwealth v. Dunnavant***, 63 A.3d 1252, 1257 n.3 (Pa. Super. 2013). The "administration of a blood test . . . performed by an agent of, or at the direction of the government" constitutes a search under both the United States and Pennsylvania Constitutions. ***Commonwealth v. Kohl***, 615 A.2d 308, 315 (Pa. 1992); ***Schmerber***[, 384 U.S. at 770].

***Commonwealth v. Evans***, 153 A.3d 323, 327-28 (Pa. Super. 2016) (brackets omitted) (emphasis added). "One such exception is consent, voluntarily given." ***Strickler***, 757 A.2d 888 (citation omitted). Under the Fourth Amendment, where an encounter between law enforcement is lawful, voluntariness of consent to a search becomes the exclusive focus. ***Id.*** In ***Commonwealth v. Smith***, 77 A.3d 562 (Pa. 2013), our Supreme Court explained:

> In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

***Smith***, 77 A.3d at 583 (citations, quotation marks and ellipses omitted). In explicating voluntariness under similar circumstances, we have stated:

> While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right

- 10 -

to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

*Commonwealth v. Geary*, 209 A.3d 439, 443 (Pa. Super. 2019) (citation omitted).

It is well settled that in DUI cases, a police officer requesting that a motorist submit to a warrantless blood draw "ha[s] no obligation to enlighten [the motorist] as to the full details of federal constitutional law; [the police officer] only need[] tell [the motorist] the current, legal consequences of refusing to consent to the blood-draw." *Commonwealth v. Venable*, 200 A.3d 490, 498 (Pa. Super. 2018) (citation omitted; bracketed information amended; emphasis added); *see also Commonwealth v. Myers*, 164 A.3d 1162, 1171 (Pa. 2017).

Instantly, based upon the totality of the circumstances, we conclude that the trial court did not err in denying Appellant's suppression motion on the finding that he voluntarily consented to the blood draw. As the trial court reasoned:

The record reveals that [Appellant] was made well aware of his right to refuse to submit to the blood draw. Both Sergeant Smith's testimony at the August 10, 2018 suppression hearing and the recording of [Appellant]'s processing at the DUI Center indicate that Appellant was advised several times of his right to either consent or refuse to submit to the blood test. Further, Sergeant Smith patiently discussed and explained the consequences of refusal, allowed [Appellant] ample time to review the consent form and ask questions, and spent several minutes answering any questions [Appellant] had regarding the consent form or his rights.

There is no indication that [Appellant] held any erroneous subjective beliefs about whether he could refuse, or about what

the consequences of refusal would be.[7] In any event, any misguided subjective beliefs that [Appellant] may have held would have been extinguished by Sergeant Smith's numerous express instructions regarding [Appellant's] right to refuse and the consequences of doing so. Though [Appellant] urges that no such conversation took place regarding the nature of [Appellant's] right to refuse to submit to the blood draw, the recording of [Appellant's] processing, the transcript thereof, and the testimony given at the August 10, 2018 suppression hearing all indicate that Sergeant Smith and [Appellant] spent several minutes discussing the implications of [Appellant's] choice to either consent or refuse to submit to the blood draw.[8]

[Appellant's] contentions that Sergeant Smith employed coercive tactics to induce [his] consent involuntarily are simply not supported by the facts. Sergeant Smith remained patient and cordial with [Appellant] despite the latter's antagonistic and profane remarks. Sergeant Smith repeatedly advised [Appellant] that he needed to provide a yes or no response regarding the blood draw and politely asked [Appellant] whether he consented or not. Although [Appellant] suggests that Sergeant Smith's

_____

[7] In **Commonwealth v. Miller**, 186 A.3d 448 (Pa. Super. 2018), **appeal denied**, 199 A.3d 858 (Pa. 2018), the defendant argued that because of a prior DUI arrest, he was under the subjective belief that he was subject to enhanced criminal punishment if he refused to consent to a blood draw. **Id.** at 449-450. The **Miller** court, citing a contemporaneous decision in **Commonwealth v. Robertson**, 186 A.3d 440 (Pa. Super. 2018), **appeal denied**, 195 A.3d 852 (Pa. 2018), rejected the suppression court's rationale for granting the defendant's motion to suppress because "defendants are presumed to know case law in addition to statutory law," and the police do not have an affirmative duty to "inform defendants that they do not face enhanced criminal penalties if they refuse a blood test." **Miller**, 186 A.3d at 450, citing **Robertson**, 186 A.3d at 446; **see also Commonwealth v. Krenzel**, 209 A.3d 1024, 1029 (Pa. Super. 2019) (finding that a defendant's reliance on her subjective, albeit erroneous, misunderstanding of constitutional law does not render her consent involuntary), **appeal denied**, 222 A.3d 370 (Pa. 2019).

[8] To the extent Appellant invites us to accept his proffered version of the facts or to credit his testimony, we decline the invitation. **See Commonwealth v. Fudge**, 213 A.3d 321, 326 (Pa. Super. 2019) (citation omitted) (noting that we will not disturb a suppression court's weight and credibility absent a clear and manifest error), **appeal denied**, No. 422 MAL 2019, 2019 WL 7207309 (Pa. filed December 27, 2019); **see also Commonwealth v. McCoy**, 154 A.3d 813, 816 (Pa. Super. 2017) ("[I]t is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony.").

positioning of himself directly beside [him] during the blood draw was somehow coercive, the [c]ourt finds that this action was a reasonable measure taken to ensure the safety of the phlebotomist and other DUI Center personnel during the administration of the blood draw. Moreover, [Appellant] had already given his consent for the blood draw by this time. The [c]ourt gleans no indication from the record that these circumstances in anyway impaired [Appellant's] volition or otherwise induced [him] to involuntarily consent to the blood draw.

The [c]ourt is further satisfied that [Appellant's] custodial status did not inhibit his ability to voluntarily consent to the blood draw. Testimony from Sergeant Smith indicated that the door to the DUI Center were secured from the inside, but were not locked so as to prevent someone from exiting the center.

Moreover, [Appellant] was completely unrestrained during his DUI processing. [Appellant], who had time to carefully consider his decision to refuse or consent and ample opportunity to inquire about his right to refuse, ultimately signed the consent form and permitted the blood draw to proceed. Despite [Appellant's] argumentative and at times confrontational demeanor, the record reflects that [Appellant] generally cooperated with law enforcement personnel at critical points of the DUI processing. Defendant even removed his jacket to allow the phlebotomist to begin the blood draw.

Trial Court Opinion, 11/21/18, at 3-5 (record citations and footnotes omitted).

Accordingly, based on the facts detailed above, the trial court's findings, and the totality of the circumstances in this case, we conclude that the court did not err in denying Appellant's suppression motion. *See Geary*, 209 A.3d at 443-44 (finding voluntarily consent, despite defendant's allegation of duress and coercion, when defendant was brought to a standard DUI processing room, informed of right to refuse, no coercive techniques were used and defendant cooperated with police); *see also Commonwealth v. Robertson*, 186 A.3d 440 (Pa. Super. 2018) (finding consent voluntary where police did not use coercive tactics, defendant was informed of her right to

refuse, and subsequently cooperated with the blood draw), ***appeal denied***, 195 A.3d 852 (Pa. 2018).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/24/20